[Crim. No. 13964. Fourth Dist., Div. One. June 28, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD MUNOZ, Defendant and Appellant.

[Crim. No. 15029. Fourth Dist., Div. One. June 28, 1984.]

In re EDWARD MUNOZ on Habeas Corpus.

■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, and Augustus E. Noland, Deputy State Public Defender, for Defendant and Appellant and Petitioner.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and W. Scott Thorpe, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

WIENER, J.—The ringing of three shots shattered the calm of Oceano on a Sunday night, May 11, 1980. John Klima had been murdered. The shots had come from the interior of a 1955 blue Victoria Ford driven by 18-year-old Eduardo Ramirez. A jury determined defendant Edward Munoz was a passenger in the rear of that vehicle and was the person responsible for Klima's tragic and senseless killing. Munoz was convicted of first degree murder (Pen. Code, §§ 187/189)[1] while personally using a firearm (§ 12022.5) and sentenced to prison for 27 years to life.

Munoz attacks the judgment entered on the jury verdict with a barrage of arguments. When those arguments were first made some of the issues raised were awaiting resolution in cases pending before the California Supreme Court. Those issues have since been resolved and this case has now been retransferred to us with directions to file a modified opinion with appropriate reference to *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] and *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24 [196 Cal.Rptr. 704, 672 P.2d 110]. Pursuant to those directions, and without further discussion, we reject Munoz' argument the felony-murder rule should be abolished (*People* v. *Dillon, supra,* 34 Cal.3d at pp. 462-476)

---

[1] All statutory references are to the Penal Code unless otherwise specified.

and the court erred in failing to suppress two surreptitious tape recordings of his conversations while he was a pretrial detainee. (*Donaldson* v. *Superior Court, supra,* 35 Cal.3d at pp. 34-39.) Although Munoz' claim of insufficiency of the evidence to support a verdict of premeditated first degree murder has merit, we decide the instructional error is harmless in light of our conclusion the jury resolved his guilt on the basis of the felony-murder rule. We also reject his claims of other trial (*People* v. *Cardenas* (1982) 31 Cal.3d 897, 903-910 [184 Cal.Rptr. 165, 647 P.2d 569]) and instructional errors and therefore affirm the judgment. We decline to modify that judgment by reducing Munoz' felony-murder conviction from first to second degree. (*People* v. *Dillon, supra,* 34 Cal.3d at pp. 476-489.) Finally, we deny Munoz' consolidated writ of habeas corpus.

FACTS

 In reviewing a claim of insufficiency of the evidence to support a first degree murder conviction, we must examine the entire record in the light most favorable to the judgment in order to determine whether it discloses substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. In making this determination, we must presume in support of the judgment the existence of every fact which the trier of fact could reasonably deduce from the evidence. We may not, however, limit this review to the evidence favorable to the People, for the insufficiency issue must be resolved on the whole record in order to evaluate properly whether the evidence of each of the essential elements is substantial. This evidence must be reasonable, credible and of solid value. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 575-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Because of this mandate, and Munoz' alibi theory of defense, the facts are stated in a detailed fashion to assure a careful analysis of his insufficiency argument.

Ramirez was a key witness for the prosecution; he alone fingered Munoz as the killer. Although Ramirez was biased because of his bargain with the district attorney,[2] the jury accepted his version of the following events.

Between 6 and 6:30 p.m. on May 11, 1980, Ramirez, Munoz and Raul Galvan started to go "cruising." Ramirez was driving; Munoz was alone

---

[2]The criminal complaint charged Munoz and Galvan with murder and firearm use (count 1) and Galvan and Ramirez with being accessories after the fact (§ 32; count 2). Before the preliminary hearing Ramirez made a deal with the district attorney. In exchange for Ramirez' testimony consistent with his earlier statements to the police that Munoz was the killer, the district attorney agreed not to file a murder charge against him and to recommend a commitment to the California Youth Authority. Before Munoz' trial, Ramirez pleaded guilty to being an accessory and when he testified was awaiting sentence on that charge.

in the back seat. Between 7 and 7:30 p.m., Munoz and Galvan went into Ophelia Yracheta's house for about five minutes. When they returned Peter Salinas was with them. Salinas and Munoz had a short, whispered conversation in the back seat. Salinas left and Munoz, Galvan and Ramirez drove off.

About 10 p.m., Ramirez saw a man crossing the street. Munoz told Ramirez to drive up to the man and to stop the car. Munoz asked for directions to Los Angeles and the man, Klima, responded. Ramirez drove off but at Munoz' request backed the car to question the man again. Klima said to keep going the same way. Ramirez began to drive away when Munoz told Ramirez to stop. Munoz again asked Klima for directions. When Klima bent down to answer, Munoz demanded his wallet. Klima took a step backwards; Munoz shot him from a distance of four to five feet. Ramirez heard three shots from the back of the car, saw Klima grab his chest and heard him yell for help. Munoz told Ramirez to drive away, hitting him on the back of the head when he did not immediately do so. Ramirez asked why Munoz shot the man. Munoz said "For the hell of it." Ramirez testified there had been no discussion of a robbery and he did not know there was a gun in the car.

Several neighbors saw Ramirez' car drive past Klima and observed the conversation and gestures between Klima and the car's occupants. The neighbors heard shots, Klima's shout for help and saw the car speed away. Joseph Gaittan, a neighbor, rushed to help Klima and asked who had shot him. Klima answered "Young kids." Klima died from a .22 caliber gunshot wound to the chest. The 35 degree downward angle of the wound indicated that if Klima were four to five feet away from the weapon then he had been bending over or the assailant had fired from several feet above him.

After Munoz and Galvan jumped out of the car, Ramirez went home. He looked for but was unable to find a gun in the car. The next morning he found a .22 caliber pistol under a rug in the back seat and put it in the glove compartment. That same morning Salinas telephoned and asked Ramirez to meet Munoz and Galvan at Jerry Rodriguez' house. There Ramirez talked with Munoz but did not give him the gun. Ramirez left with Larry Croy. Croy saw the gun in Ramirez' glove compartment. About 7:30 p.m., Ramirez returned to Rodriguez' house. As he was giving the gun to Rodriguez, Salinas grabbed it and threw it under a bed. Ramirez told Salinas to give the gun back to Munoz.

Ramirez was arrested for murder between 1:30 and 2 a.m. on May 13. He first lied, telling the investigating officers he had been at his girlfriend's house on the night of the killing but later told them essentially the same facts to which he testified at trial. He blamed the murder on Munoz. He

failed to mention Munoz' demand for Klima's wallet or his own possession of the gun the day after the shooting. Only after the preliminary examination—two weeks before trial—did Ramirez add these elements to his story. He explained he was afraid he could still be charged with murder and that this information might further implicate him.

Salinas relied on his privilege against self-incrimination when asked if he were with Munoz the day of the shooting, whether he possessed a .22 caliber weapon, or whether Ramirez had ever admitted shooting Klima. District attorney investigator Ray Jauregue testified that in an interview on May 15, Salinas admitted he had put a .22 caliber revolver under the back seat of Ramirez' vehicle on May 11 before 8:30 p.m. when he was in the car with Munoz, Ramirez and Galvan. Salinas said he had forgotten to take the gun when he left the vehicle.

On May 16, San Luis Obispo sheriff's detective Larry Hobson secretly recorded a conversation between Munoz, Ramirez and Galvan while the three were in custody in a sheriff's department transportation van outside the municipal court. A portion of this tape was played to the jury and a partial transcript received in evidence.[3]

---

[3]The transcript states: "MUNOZ: Hey, we got to get in touch with Bear. He said that my jefita and my carnala . . .

"GALVAN: I know that's what I heard.

"MUNOZ: put rata (snitched) on him that he had a gun. I go back to him, I go 'I do not think that my jefita would do that.' They just want information on him. He fucked up, man. I told him like that.

"GALVAN: And they got it.

"MUNOZ: They got what?

"GALVAN: They seen the gun.

"MUNOZ: They seen the cuete?

"RAMIREZ: You know what he told me? You know what he told me?

"GALVAN: What? That he threw the cuete away?

"MUNOZ: That he doesn't know where it's at. Right there. He fucked up. You know what else he's doing?

"GALVAN: What?

"MUNOZ: He's going to take a lie detector's test.

"GALVAN: He's going to fuck up.

"MUNOZ: Don't take that either.

"RAMIREZ: They can't use it in court.

"MUNOZ: I know, but still don't take it.

"GALVAN: They'll fuck you around if they catch you in a lie once.

"MUNOZ: Bear.

"GALVAN: It's stupid.

"MUNOZ: Bear's fucking up.

"MUNOZ: Jud, I thought you were fucking up. You haven't talked to them?

"RAMIREZ: Fuck no!

"MUNOZ: Because you know what's going to happen if you do (inaudible).

"RAMIREZ: Oh, I know, I know.

"MUNOZ: You're not going to make it through nowhere.

"RAMIREZ: I know, I know all that shit.

On May 31, personnel at the San Luis Obispo County Jail monitored and secretly recorded a conversation over the telephone in the county jail visting center among Munoz, his mother and Aurora Galvan. A portion of this tape was also played to the jury and a transcript of the portion played was entered into evidence.[4] Of significance is Munoz' statement to Aurora that she should remember to say they had been together at Ophelia's house at the time of the crime.

Munoz was arrested two days after the killing. He testified he was at Ophelia's house on the day of the killing from between 8 and 8:30 p.m. until the next morning. He denied ever being in Ramirez' vehicle on May 11, 1980. He also denied handling Salinas' .22 caliber pistol, he did see Ramirez hand Salinas a gun on May 12, 1980, at Rodriguez' house. With respect to the recorded jailhouse conversation with Aurora Galvan, Munoz claimed he was just trying to get her to tell the truth. He also denied he threatened Ramirez when they were together in the transportation van. Munoz claimed his reference to "Bear is fucking up" meant only that he was just trying to protect Salinas' rights. Munoz also said that on May 12, Ramirez admitted the killing in attempting to rob an old man. The reason Ramirez blamed Munoz was that both had dated Aurora Galvan.

Irma Rangel testified that on May 11, Munoz remained at Ophelia's house from about 7:45 p.m. until after 6 a.m. the next morning.

---

"MUNOZ: You're going to get stuck wherever you go.
"RAMIREZ: I know all that shit already.
"MUNOZ: They just want to make it look like I'm the one that done it.
"RAMIREZ: If there's anything left out (inaudible)."

[4]The transcript states: "MUNOZ: No. And when—that when you told the police that they picked—you picked me up at 2:30, shouldn't have said that because then that fucked me up. When you go to court testify and tell them that we were at the beach in the daytime and then we went to Faye's and we had a dinner down there at 8 o'clock and around 8 o'clock we had dinner for Mother's Day. You know, that we were all there. Me, you, Rachael, Ruben—
"GIRL: Uh-huh.
"MUNOZ: —that girl 'Phelia. I told them we spend the night there.
"GIRL: Uh-huh.
"MUNOZ: From 8 o'clock on.
"GIRL: But I didn't tell them that I seen you at 2:30. I told them—they asked me where I was and it was during that day and I said I was—'cause I was in Santa Maria the day before and I came home at 2:30 and that's when I got to bed.
"MUNOZ: I know. But I didn't want you to say—you shouldn't have said that. We wanted to be together all during the day and then the night too, because 2:30 you picked me up.
"GIRL: Yeah.
"MUNOZ: The murder happened at 10:30 that night. I wanted to say that—together that night, you know.
"GIRL: Yeah.
"MUNOZ: From 8 o'clock on. I mean all day and at 8 o'clock we went and had dinner at 'Phelia's house and spent the night there and that was it. Just remember to say that!
"GIRL: Yeah."

Croy testified that while intoxicated on May 12, 1980, he overheard Ramirez who was also drunk tell Munoz he had a gun and along with a couple of other people had tried to rob a man the night before. Rodriguez corroborated that on May 12, he also heard Ramirez say he had killed a man the night before. Samuel Salas, who had previously been convicted of forgery, claimed that while he and Ramirez were both in jail, Ramirez told him he had shot a man while loaded and that Munoz need not worry because Ramirez was going to "cop to it." Joe Ramirez, no relation to Eduardo Ramirez, testified that on May 12, he refused Eduardo's request for some .22 caliber bullets.

### APPEAL

### I

The jury was instructed on two alternative theories of first degree murder: premeditated first degree murder and first degree felony murder committed in the course of an attempted robbery. Munoz contends the trial court erred in instructing on premeditated first degree murder since the evidence before the jury was legally insufficient to sustain a conviction on that theory. He insists where a jury is instructed on two legal theories, one of which is not supported by the evidence, and the reviewing court cannot tell which theory the jury utilized, the conviction must be reversed. (*People* v. *Green* (1980) 27 Cal.3d 1, 70-71 [164 Cal.Rptr. 1, 609 P.2d 468].)

The issue of premeditation and deliberation in the case before us is a close one. "Numerous decisions have discussed and defined the concept of premeditation as it serves to distinguish first and second degree murder. A killing is deliberate, they explain, if the killer acted " 'as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on cooly and steadily, [especially] according to a preconceived design.' " [Citations]; (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26 [73 Cal.Rptr. 550, 447 P.2d 942].) 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes . . . those homicides . . . which are the result of mere unconsidered or rash impulse hastily executed.' [Citations.]" (*People* v. *Velasquez* (1980) 26 Cal.3d 425, 435 [162 Cal.Rptr. 306, 606 P.2d 341], judgment vacated and cause remanded (1980) 448 U.S. 903 [65 L.Ed.2d 1132, 100 S.Ct. 3042], reiterated (1980) 28 Cal.3d 461 [171 Cal.Rptr. 507, 622 P.2d 952].) In *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], our Supreme Court explained: "The type of evidence which this court has found sufficient to sustain a finding of premeditation

and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' (*People* v. *Thomas, supra,* 25 Cal.2d 880, at pp. 898, 900, 901 [156 P.2d 7]); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.,* at pp. 26-27, italics in original.) ▪ Although the evidence must be considered in the light most favorable to the judgment, we believe the requisite solid evidence of premeditated first degree murder is lacking.

At trial, the district attorney argued the only evidence to support the premeditated killing occurred between Munoz' first contact with Klima and the shooting.[5] On appeal, the Attorney General points out the jury could have drawn reasonable inferences of premeditation and deliberation from Munoz' possession of the weapon after it was given to him by Salinas and in the planning activity during his several confrontations with the victim. On the basis of these facts, combined with Munoz' senseless desire to shoot

---

[5] On this issue the district attorney's entire argument is as follows: "In this case, the People's evidence establishes a willful, deliberate and premeditated murder. If you believe that from the time defendant Munoz contacted the victim the first time, hassled him, asked him directions—and I use the word hassle, not in a normal tone. I mean, ask him directions that Munoz did not really need. Ask him directions, kind of in a nonsense way. If you believe that between that contact—excuse me, and the contact down the street on Vista, if you believe that that contact—between those two contacts you had an intent on Mr. Munoz's part to kill Mr. Klima for some reason, either because of his statement, 'For the hell of it,' that that's when he decided to kill him for the hell of it, or he was just in the mood to kill someone that night.

"That is the only portion of the act that you could find to be willful, deliberate and premeditated if you believe that happened. And, of course, since Mr. Munoz denied that he was there, you don't get anything along the lines of his intents from his testimony, other than that he wasn't there."

someone that night, the Attorney General asserts the jury had adequate facts to find Munoz guilty of premeditated first degree murder.

Admittedly, this is a difficult case. In our judgment, however, the events surrounding the killing do not contain sufficient solid planning or motive facts of credible value to support a murder conviction on that theory. Under the circumstances of this case the brief time, seconds, from Munoz' first confrontation with Klima until the shooting do not establish the killing was the result of preexisting reflection, careful thought and weighing of considerations.

The *Green* rule upon which Munoz relies is limited to situations in which the reviewing court cannot discern upon which theory the jury relied, i.e., there must have been "ample reasons for the jury not to rely on the [legally sufficient] evidence. . . ." (*People* v. *Green, supra,* 27 Cal.3d at p. 71.) Here, a majority has no doubt the jurors reached their verdict by way of the felony-murder rule's imputation of malice. To require reversal under these circumstances necessitates an assumption the jury premised its verdict on a legal theory on which a majority agrees there was inadequate evidentiary support with only token argument, while ignoring the uncontradicted evidence of felony murder presented under a theory described by the prosecution as "the more apt to be applicable to this case." Under these circumstances, the instructional error of which Munoz complains has not resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; *People* v. *Green, supra,* 27 Cal.3d at p. 74; cf. *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 765 [175 Cal.Rptr. 738, 631 P.2d 446].)

II

▮▮▮ Munoz' next contention is the trial court prejudicially erred by allowing the prosecutor to question Munoz and his witnesses regarding Mexican youth gang membership.

In his cross-examination of defense witness Rodriguez, the prosecutor inquired whether Rodriguez and Munoz were in any clubs together. After colloquy on this issue, in the absence of the jury, the court permitted the deputy district attorney "to do some probing and some fishing to see what answers you get" but ordered the People not to use the word "gang" in any of his questions.[6] Munoz challenges the court's semantic solution be-

[6]The pertinent dialogue between defense counsel and the court on this issue is as follows: "MR. DORSI: Well, I don't deny that he has some right to do some probing. What I'm saying, if he's going to ask him regarding gangs, if he would say clubs or club, that's fine. He has already explored that, and Mr. Rodriguez has denied the clubs.

"And as long as it relates to some type of club or other type of association, I think that

cause it permitted "equally devastating transparent synonyms, 'association,' 'group,' 'club,' and 'brothers.' "[7]

those questions are appropriate and I haven't objected to them. I just think Mr. La Barbera [deputy district attorney] is going to try and ask questions that infer an association for purposes of criminal activity, that those questions in themselves would be inappropriate.

"That would be my only objection.

"THE COURT: All right. I'm going to overrule the objection. I'm going to allow him to ask the questions, but I'm going to restrict the use of the word gang.

"Your motion under section 352 to exclude the evidence as being unduly prejudicial is going to be denied on the condition that the questions do not involve the use of the word gang, but involve the word club. I feel under those circumstances their probative value will outweigh any prejudice that may result."

[7]The following are all references in the record to which Munoz has directed us on this issue.

"Q. [to Rodriguez]: Well, you indicated you had a *group* of people that were in an *association* that is not a very good association, isn't that true?

"A. Yeah, but they're just friends.

"Q. Okay. Do you have a name of the association or a club name?

"A. No.

"Q. You've never heard of the term Pee Wee Locos?

"A. I've heard of it.

"Q. Aren't you a member of that?

"A. No, I ain't.

"Q. Is Mr. Munoz a member of that club?

"A. I don't know.

" . . . . . . . . . . . . . . .

"Q. And you're not aware of whether he's a member of a club called Pee Wee Locos?

"A. No, I'm not.

"Q. Have you ever heard of that club?

"A. Yes, I have.

"Q. Have you ever been in that club?

"A. No, I haven't.

"Q. Is that club, to your knowledge, in existence today?

"A. I can't say.

"Q. Are you sworn to secrecy or something?

"A. No, I ain't.

"Q. Why can't you say?

"A. 'Cause I don't know.

"Q. Have you ever tried to get in that club?

"A. No, I haven't.

"Q. Have you ever heard of the term Oceano Trece?

"A. Yes, I have.

"Q. What does that mean?

"A. That means Oceano.

"Q. Oceano what?

"A. Thirteen.

"Q. Thirteen. Are you one of those thirteen?

"A. No, I'm not.

"Q. Is Mr. Munoz?

"A. I don't know.

"Q. Have you ever been one of that thirteen?

"A. No.

"Q. And you don't know if Mr. Munoz is or is not?

"A. No, I don't.

" . . . . . . . . . . . . . . .

"Q. He's [Ramirez] testifying against one of your brothers; isn't he?

In *People v. Cardenas, supra,* 31 Cal.3d 897, the California Supreme Court recently addressed the prejudicial effect of questions eliciting gang membership. The concern expressed in the lead opinion was that reference to "common gang membership" creates "a substantial danger of undue prejudice" because a jury could improperly infer the defendant has a criminal disposition from membership in a youth gang which commits criminal acts and thus, from that predisposition, infer guilt in a particular case. *(Id.,* at pp. 904-905.) The plurality opinion states: "In Southern California, Chicano youth gangs have received widespread media publicity for their purported criminal activities. In this case, the prosecutor did not specifically refer to the El Monte Flores as a youth gang. However, the jury undoubtedly identified the group as such, either from their personal knowledge or from their in-court observations of the witnesses' age, ethnicity, and tattoos." *(Id.,* at p. 905.) Consequently, at first blush it appears *Cardenas* stands for the proposition that reference to "gang" membership or words having a comparable connotation is prejudicial. On closer analysis, however, we conclude *Cardenas* is distinguishable from the present case and the questions asked, even if improper, do not require reversal.

 As a general proposition, ". . . a witness may, on cross-examination, be asked about group membership he shares with a party to the action, on the theory that such common membership is a factor that tends to impeach a witness' testimony by establishing bias. . . . Thus, the prosecution in the instant case properly could inquire of [defense] witnesses . . . regarding their friendship with Wing, including their common group membership, as a means of attacking their credibility as witnesses, by establishing a bias in favor of the minor." *(In re Wing Y.* (1977) 67 Cal.App.3d 69, 76-77 [136 Cal.Rptr. 390]; see also cases cited in *People v. Cardenas, supra,* 31 Cal.3d at p. 916, dis. opn. of Richardson, J.) Here, the excerpted portions of the testimony (see fns. 6 and 7, *ante*) indicate that, with defense counsel's acquiescence and consistent with *Wing Y.,* the prosecutor limited his inquiry to possible bias or prejudice flowing from a common club or association relationship. Unlike *Cardenas,* he did not add any fillips relating to violence or hostilities between competing groups.

Arguably, once Rodriguez testified to being Munoz' friend, *any* evidence of mutual "club" or "gang" affiliation became cumulative. And, unquestionably, " '[t]he prosecution has no right to present cumulative evidence which creates a substantial danger of undue prejudice to the defendant.' " *(People v. Cardenas, supra,* 31 Cal.3d at p. 905, quoting from *People v. De La Plane* (1979) 88 Cal.App.3d 223, 242 [151 Cal.Rptr. 843],

---

"A. That's right.
"Q. One of your club members—I'm sorry, that's wrong?
"A. That's wrong."

cert. den., 444 U.S. 841 [62 L.Ed.2d 53, 100 S.Ct. 81].) Even assuming error, however, the issue remains whether the error in allowing the questioning was prejudicial.

The determination of prejudice in *Cardenas* followed from the court's conclusion there was "cumulative prejudice" resulting from the trial court's "*several evidentiary errors.*" (31 Cal.3d at p. 907, italics supplied.) The several evidentiary errors included not only the cumulative evidence of gang membership, but also the fact that, "[o]n at least two occasions, the prosecutor posed questions . . . ." (*id.,* at p. 905) unrelated to whether the witnesses and defendant were close associates and which ". . . suggested to the jury that hostilities existed between the two youth gangs. Given the widespread publicity concerning violence between rival youth gangs, the jury may well have assumed that members of the Flores gang were accustomed to using violence to further their interests." (*Id.,* at p. 905.) In addition, and "even more serious," was the error relating to the prosecutor's line of questioning which left the impression that the attempted robbery was a gang operation. (*Ibid.*) "Thus, the trial court's error in admitting the evidence of common membership in the Flores gang was compounded by the prosecutor's broad inquiries suggesting that the gang was involved in criminal activities. These questions made it a near certainty that the jury viewed [defendant] as more likely to have committed the violent offenses charged against him because of his membership in the Flores gang." (*Id.,* at p. 906.) Unlike *Cardenas,* no such references or inferences occurred in the questioning by the district attorney in the case before us. *Cardenas* also held evidence of the defendant's narcotics addiction was improperly introduced to establish a financial motive for the attempted robbery. There, witnesses testified ". . . at great length about [defendant's] physical condition at the time of his arrest, the length of time [defendant] had been using narcotics, and the alleged size and value of [defendant's] heroin habit." (*Id.,* at p. 907.) Again, the record before us is devoid of any such irrelevant evidence similar to that presented in *Cardenas.*

Whether an evidentiary ruling results in prejudice turns in part on how strong the prosecution case is, as evaluated by the jurors called upon to render judgment. Here, as in *Cardenas,* the jury deliberated for about 12 hours, indicating the issue of guilt was not "open and shut." (*People* v. *Cardenas, supra,* 31 Cal.3d at p. 907.) Nonetheless, in the context of the limited questions asked and the neutral responses given, we do not believe it is reasonably probable that a result more favorable to Munoz would have been reached if evidence pertaining to club membership had not been admitted. We therefore hold no miscarriage of justice occurred under article VI, section 13 of the California Constitution. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## III

We also reject Munoz' contention that it was prejudicial error for the trial court to instruct on consciousness of guilt without including a limiting instruction that such evidence could not be considered on the question of his state of mind before committing the crime. (See *People* v. *Anderson, supra,* 70 Cal.2d at p. 32.) Munoz' failure at trial to request a qualification of this instruction precludes our consideration of this argument in his appeal. Moreover, his assertion of error on this ground was properly rejected. (*People* v. *Mathews* (1979) 91 Cal.App.3d 1018, 1027 [154 Cal.Rptr. 628].)

Munoz further urges trial court error in allowing references to a polygraph test. (See fn. 3, *ante.*) Again, no objection to the tape recording and/ or transcript on this ground was made at trial. In addition, this is not a case where the prosecutor commented on defendant's rejection of an offer to take a lie detector test. The trial court properly ruled on Munoz' Evidence Code section 352 objection.

## IV

Relying on *People* v. *Dillon, supra,* 34 Cal.3d 441, Munoz contends we must reduce his felony-murder conviction from first to second degree. Although *Dillon* upheld the felony-murder rule against a barrage of constitutional attacks, it also held "that the penalty for first degree felony murder, like all statutory penalties, is subject to the constitutional prohibition against cruel or unusual punishments (Cal. Const., art. I, § 17), and in particular to the rule that a punishment is impermissible if it is grossly disproportionate to the offense as defined or as committed, and/or to the individual culpability of the offender. (*In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].) Because such disproportion is manifest on the record before us—as it was to the triers of fact—we modify the judgment to punish this defendant as a second degree murderer." (*Id.,* at p. 450.)

At the outset, we stress *Dillon*'s application of a proportionality analysis to reduce a first degree felony-murder conviction must be viewed as representing an exception rather than a general rule. The *Dillon* majority on this point (Mosk, J., Bird, C. J., Kingsley, J., Reynoso, J.) itself recognized the exceptional nature of its result. After noting the "broad factual spectrum" of acts punishable as first degree felony murder, and further noting the Legislature has provided the same punishment for first degree felony murder as for deliberate and premeditated murder committed with malice aforethought, the majority states: "As the record before us illustrates, however, in *some* first degree felony-murder cases this Procrustean

penalty *may* violate the prohibition of the California Constitution against cruel or unusual punishments. [Citation.]" (*People* v. *Dillon, supra,* 34 Cal.3d at p. 477, italics added.) Thus, *Dillon* does not "mandate" a reduction of Munoz' conviction. (See dis. opn., *post,* at p. 1019.) A mandatory interpretation of *Dillon*'s proportionality analysis would effectively eliminate the crime of first degree felony murder. Such a result would contravene the separation of powers inherent in our tripartite system of government (Cal. Const., art. III, § 3; *In re Lynch* (1972) 8 Cal.3d 410, 414 [105 Cal.Rptr. 217, 503 P.2d 921]) and, somewhat ironically, would also nullify *Dillon*'s defense of the felony-murder rule. We rather doubt the *Dillon* court intended parts III and IV of its opinion (upholding the felony-murder rule) should self-destruct by virtue of part V (applying its proportionality analysis).

Turning to the merits, unlike *Dillon,* this is *not* a case in which disproportionality "is manifest on the record before us—as it was to the triers of fact. . . ." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 450.) We agree with *Dillon*'s assessment "that when it is viewed in the abstract robbery-murder presents a very high level of such danger [to society], second only to deliberate and premeditated murder with malice aforethought." (*Id.,* at p. 479.) Beyond this point we part company with *Dillon.* The facts of the crime as committed in this case and the particular nature of the offender who committed that crime (*ibid.*) prevent us from taking a benign or sympathetic view of Munoz' individual culpability. We therefore decline to reduce his conviction to second degree murder.

We share the sentencing court's view of Munoz' crime. As the court explained to Munoz: "In this sentence I would like to add that the court has been concerned very much about the fact that this was a senseless killing; that there was apparently no previous contact between you and the victim; that a man who was totally innocent, a good citizen apparently, was struck down for no good cause, and I feel that you, having been found guilty of this offense by the jury after a full and fair trial, it will be required that you serve your sentence as required by law." As is apparent from the court's remarks and from the facts of the crime (see *ante*), this is *not* a case in which the shooting "was a response to a suddenly developing situation that defendant perceived as putting his life in immediate danger." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 488.) The record before us reflects no self-defense nuances or any indications of uneasiness or panic (*id.,* at p. 482) on Munoz' part. The totality of the circumstances surrounding Munoz' commission of the crime (*id.,* at p. 479) persuades us punishment for first degree felony murder is not disproportionate to Munoz' individual culpability.

We reach the same conclusion when we consider Munoz' background and characteristics as a defendant, including "such factors as his age, prior

criminality, personal characteristics, and state of mind." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.) At the time of his offense, Munoz was an adult, one month away from his 21st birthday. As described in the probation report, "[d]uring [Munoz'] adolescent years, past probation officers have noted that he was an intelligent and responsive young man who was capable of demonstrating excellent leadership and control. Unfortunately, instead of serving the Mexican/American community and benefiting them with his courage, strength and rightness, he chose to bring shame on them by frightening and abusing the very community that he should be serving. . . . As in past and present investigative reports, the Defendant still continues to enjoy a position of leadership in the gang element in Oceano, California." As suggested in this description, Munoz had an extensive record of prior criminality.[8] In short, Munoz does not stand before us as "an unusually immature youth" who has had "no prior trouble with the law." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 488.) Nor did Munoz' state of mind at the time of the crime ("For the hell of it") evoke any sympathy from either the jury or the trial judge. We are likewise unmoved.

Absent any showing either at trial or on appeal of Munoz' "attenuated individual culpability" (*People* v. *Dillon, supra,* 34 Cal.3d at p. 486), we need not compare Munoz' punishment with that given his codefendants or with that which the parties may have expected would be imposed. (See *id.,* at pp. 486-488.)

### WRIT OF HABEAS CORPUS

 Munoz petitions for habeas corpus alleging he was denied the effective assistance of counsel. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 421-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) He claims his

---

[8]The probation report narrates Munoz' prior record as follows: "The Defendant's contact with the San Luis Obispo County Probation Department dates back to 1972, when at the age of 13 a Petition in Juvenile Court was sustained for extortion. Subsequent Petitions were sustained involving truancy, intoxication, lack of parental control, joy riding, resisting arrest, and robbery. As a result of these Petitions, the Defendant spent time in a foster home, County level boys camp, and ultimately committed to the California Youth Authority at the age of 17 after robbing an 80 year old man of $15.00. Since being paroled from the California Youth Authority, the Defendant has been a suspect in an armed robbery, and on January 8, 1979, pled guilty to public intoxication and possession of an alcoholic beverage in the San Luis Obispo Municipal Court, Grover City Branch. On April 9, 1979, the Defendant appeared in the San Luis Obispo Municipal Court, Grover City Branch, and entered a plea of guilty to paint sniffing and was placed on bench probation for one year and ordered to pay a $100.00 fine. On October 10, 1979, the Defendant again appeared in the San Luis Obispo County Municipal Court, Grover City Branch, and admitted to a violation of his probation at which time his probation was reinstated, modified, extended and placed on two years formal probation commencing from April 9, 1979, and directed to spend two days in custody commencing on November 2, 1979. On June 18, 1980, at a probation violation hearing, the Defendant's probation was reinstated and terminated on motion of the court."

lawyer (1) should have objected to the tape-recorded conversation in the van because it contained improper references to polygraph testing, (2) should have established a better record to show Munoz' statements were caused by a delayed arraignment and an agency relationship between the police and Ramirez, and (3) should have had Munoz take a polygraph test before trial.

Appellate counsel has asked us to ponder why Munoz' trial counsel failed to ask certain questions at trial. Why was Munoz' arraignment delayed nine days? What was the relationship between Ramirez and the police at the time the police surreptitiously taped their conversation in the police van? Counsel legitimately asserts that had these questions been asked they would have led to further inquiry and valid objections on constitutional grounds. (See *Rhode Island* v. *Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682]; *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183]; *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199].) Although these arguments appear to have merit, we decline to issue an order to show cause or to find lawyer incompetence on this record alone. We adhere to the philosophy expressed in *In re Lower* (1979) 100 Cal.App.3d 144, 152-153 [161 Cal.Rptr. 24], that except in unusual cases the writ should be filed in the superior court for a factual determination on the issues presented. The record before us is devoid of any statement from Munoz' trial counsel and we will not foreclose his opportunity to respond. Accordingly, for procedural reasons only we deny Munoz' petition for writ of habeas corpus. (See also *People* v. *Perry* (1979) 100 Cal.App.3d 251, 265 [161 Cal.Rptr. 108]; *People* v. *Adams* (1980) 101 Cal.App.3d 791, 802 [162 Cal.Rptr. 72]; *People* v. *Hall* (1980) 28 Cal.3d 143, 158 [167 Cal.Rptr. 844, 616 P.2d 826].) We stress, however, the denial of the writ is grounded solely on procedural considerations and should not be construed as a holding on any of the issues presented.

### DISPOSITION

Judgment affirmed. Writ denied.

**COLOGNE, Acting P. J.**– I concur in the majority opinion in its entirety and even though I am satisfied the jury reached its verdict on the felony-murder rule believe there is sufficient evidence to support that conviction nonetheless on the theory of premeditated acts.

After the initial contact with Klima intended to hassle the victim, the party then drove away. Sometime after this, admittedly a short time later, Munoz told Ramirez to stop and back up. About this time, he obtained the gun from

Salinas and, without provocation, shot his victim "for the hell of it." He had some time in which to develop his thoughts about a killing when he told the driver to stop and backup. I believe that period of the thought process is enough to support a jury's finding premeditated and a first degree murder conviction.

"Since the decision in *People* v. *Sanchez* (1864), 24 Cal. 17, 30, it has been repeatedly declared that 'There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind,' but this is not the equivalent of saying that the *intention to kill* can be formed without being preceded by deliberation and premeditation. It is only a declaration that the act of killing may instantaneously follow the intention once the latter is finally formulated. It does not imply that mature reflection (deliberation and premeditation) need not precede the ultimate formation of the evil intention. By its very language it has reference only to the 'space of time between the intention to kill and the act of killing.' In other words, a murder is of the first degree no matter how quickly the act of killing follows the ultimate formation of the intention if that intention has been reached with deliberation and premeditation. This view of the law is manifest in the *Sanchez* case by the statement (at p. 30 of 24 Cal.) that 'The intent to kill must be the result of deliberate premeditation; it must be formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation.' Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under differing circumstances. The true test is not the duration of time as much as it is the extent of reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides (not specifically enumerated in the statute) which are the result of mere unconsidered or rash impulse hastily executed. [¶] The word 'deliberate' is an antonym of 'Hasty, impetuous, rash, impulsive' (Webster's New Int. Dict. (2d ed.)) and no act or intent can truly be said to be 'premeditated' unless it has been the subject of actual deliberation or forethought (*id.*)." (*People* v. *Thomas* (1945) 25 Cal.2d 880, 900-901 [156 P.2d 7], italics in original; see also *People* v. *Velasquez* (1980) 26 Cal.3d 425, 435 [162 Cal.Rptr. 306, 606 P.2d 341], judgment vacated and cause remanded (1980) 448 U.S. 903 [65 L.Ed.2d 1132, 100 S.Ct. 3042], reiterated (1980) 28 Cal.3d 461.)

**STANIFORTH, J.,** Concurring and Dissenting.—We are required by the Supreme Court directive (Feb. 2, 1984) to file a modified opinion with

appropriate reference to *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] and *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24 [196 Cal.Rptr. 704, 672 P.2d 110]. The majority opinion has now complied and as to those portions of the majority opinion controlled by *Dillon* and *Donaldson* I concur. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)

I also concur with Justice Wiener's conclusion no substantial evidence supports Munoz' first degree—premeditated—murder conviction. But I dissent from the failure of the majority to comply with the mandate of *Dillon* (34 Cal.3d at pp. 477-489) and reduce the conviction to one of second degree murder. Moreover, the majority opinion, however, seeks to cover and the Supreme Court decision to not discuss that glaring void—lack of *substantial evidence* to support the "felony murder" conviction—with the unanalyzed conclusion that there was "uncontradicted evidence of felony murder." (Majority opn., *ante,* at p. 1010.) A minute search of the record fails to disclose any *substantial evidence sufficient in law* to convict Munoz of that crime. I again reflect and re-emphasize the procedural and constitutional errors committed both before and during trial—areas not yet addressed by the California Supreme Court.

I

Eduardo Ramirez was the *sole* witness connecting Munoz to the crime; he is the *lone* person who testified to implicate Munoz as to "some act or fact which was an element of the crime" which implicated Munoz. He is the self-confessed accessory to the killing of John Klima. Ramirez was originally the prime suspect for this murder yet he was not charged with murder. He was arrested, placed in jail for the Klima murder. His car had been identified as the murder vehicle; he was observed in possession of the gun used immediately after the killing. He admitted the killing to several witnesses. In this web of evidence pointing to his guilt, Ramirez told police Munoz was the killer and agreed to testify against Munoz. In return he was allowed to plead to a lesser offense—accessory after the fact—with CYA recommendation if he testified in conformity with his statement to police. At the time of trial, Ramirez had entered his plea and was awaiting sentencing.

This witness was contradicted by Munoz and at least *five* independent unimpeached witnesses. Not only was Ramirez contradicted by a multitude

of independent witnesses but his own stories were admittedly a mendacious, vacillating account more self-serving with each retelling.[1]

Whether Ramirez was an "accomplice" or a principal, as much testimony would indicate, or only an "accessory" after the fact as he pleaded in the bargain for his testimony, his statements cry out for corroboration before any credence can be given his evidence.

The rules are clear as to accomplices: "To corroborate the testimony of an accomplice, the prosecution must present independent evidence which, without aid or direction from the testimony of the accomplice, tends reasonably to connect the defendant with the commission of the crime charged. [Citation.] Corroborating evidence is insufficient if it does no more than cast a 'grave suspicion' upon the accused, or merely connects him with the crime's perpetrators. [Citation.] While the corroborating evidence need not support every fact to which the accomplice has testified, it must tend to implicate the defendant and therefore *must relate to some act or fact which is an element of the crime.* [Citations.]" (*People* v. *Mardian* (1975) 47 Cal.App.3d 16, 42 [121 Cal.Rptr. 269]; italics added.) The reasons for the rule are equally clear. An accomplice requires corroboration because of a most rational inherent distrust of a witness who bargains for his own freedom in exchange for the conviction of another. (*In re Miguel L.* (1982) 32 Cal.3d 100, 108 [185 Cal.Rptr. 20, 649 P.2d 703].) Whether accessory Ramirez is technically an accomplice is of no moment. He is immersed in, endowed with all the attributes of untrustworthiness that surround an accomplice.

The accomplice issue was submitted to the jury as a question of fact. The instructions include the requisite cautionary instructions as well as the corroboration requirements if Ramirez was found to be an accomplice of Munoz. Appellate review rules require the jury's implied finding that Ramirez either was: not an accomplice, or if an accomplice, his testimony was corroborated be respected. Such concession does however not end the substantial evidence issue.

In *In re Miguel L., supra,* 32 Cal.3d 100, the Supreme Court confronted the no-requirement-of-corroboration-of-accomplice rule found in juvenile

---

[1]Ramirez first lied to the police, claiming an alibi, then he blamed the murder on Munoz. He did not tell the police or the preliminary hearing magistrate about a Munoz demand for Klima's wallet or of his, Ramirez', possession of the gun the day after the shooting until after the preliminary examination—two weeks before trial. He explained he was afraid he or a friend would be implicated. How this story would implicate a stranger is not made clear. At the preliminary hearing Ramirez denied seeing the gun after the shooting. At trial he said he did not find a gun in his car that night but the next day he found a .22 caliber pistol under a rug in the back seat. He put the gun in the glove compartment.

proceedings and reversed a true finding of burglary (wardship) in face of the direct testimony of an admitted accomplice. The Supreme Court could well have been speaking of 18-year-old Ramirez when it said: "Evidence from an accomplice is regarded as untrustworthy because it is likely to have been influenced by the *self-serving motives of the witness.* [Citation.] Accomplice testimony is '*often given in the hope, or expectation of leniency or immunity.*' [Citations.] As a result, an accomplice has a strong motive to fabricate testimony which incriminates innocent persons or minimizes his participation in the offense and transfers responsibility for the crime to others. [Citation.]

"It is not unusual for an accomplice to falsely incriminate innocent persons to seek revenge or to protect friends who actually committed the crime with him. [Citation.] Further, an accomplice, especially one who is a minor, 'may be under great parental or social pressure to testify and to lay the blame for certain conduct or a certain condition on the accused.' [Citation.]" (*Id.,* at pp. 108-109; italics added; fn. omitted.) The court said: "The Fourteenth Amendment of the United States Constitution guarantees due process of law and mandates that 'no person shall . . . suffer the onus of a criminal conviction except upon sufficient proof . . . to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.' [Citation.]" (*Id.,* at p. 105.) and on this constitutional premise concluded: "To affirm appellant's wardship adjudication would require this court to hold that a finding of criminal conduct may be based solely on an accusation which not only lacks the traditional indicia of trustworthiness, *but also comes from an unreliable source.* Constitutional requirements of due process preclude this court from reaching such a holding. [Citation.]

"As a matter of law, there was insufficient evidence . . . ." (*Id.,* at p. 111; italics added.)

Ramirez' testimony suffers from all traditional indicia of untrustworthiness. Our duty under the due process clause of the federal Constitution precludes a finding of *substantial evidence* to support the felony murder verdict. To find substantial evidence here is to accept an appellate role as a mechanistic, preset robot, where no evaluative process is authorized once a fact finding is made by the lower court. Our justice-oriented process which demands the evidence from a law-designated suspect source be analyzed, weighed for substance. This duty is especially heavy here in the light of no corroborating evidence plus multiple independent unchallenged contradictions of Ramirez' testimony. *Corroboration* requirements have great significance in this mandated due process analysis. This gross deficiency in the evidence must be viewed in the context of multiple trial court errors, again not addressed by the controlling Supreme Court decision.

## II

On the issue of gang membership—an issue not addressed by *Dillon* or *Donaldson*, the majority seeks to distinguish *People* v. *Cardenas* (1982) 31 Cal.3d 897 [184 Cal.Rptr. 165, 647 P.2d 569], but holds the questions asked—if improper—do not require reversal. (Majority opn., *ante*, p. 1012.) Several condemned tape errors were committed by the trial court with which the majority opinion does not grapple.

### Error No. 1

Outside the presence of the jury, the prosecutor had requested and received the court's permission to cross-examine defense witnesses concerning membership in Mexican youth gangs, *even though he admitted he could not produce direct evidence proving gang membership.*[2] In face of this concession the court overruled objections based on Evidence Code section 352, hearsay and lack of relevance or good faith in asking such questions but restricted the prosecutor's vocabulary, ruling he could not use the word "gang" but the term "club" instead. The prosecutor then proceeded to ask Rodriguez, Munoz and Salas whether they were members of the "club" or "association" named the "Pee Wee Locos" or the "Oceano Trece."

### Error No. 2

The three witnesses consistently denied belonging to or knowing of Munoz' association with these groups. Rodriguez denied he was sworn to secrecy but admitted he had a tattoo saying "Ocean 13" on his hand. The prosecutor had this exchange with Munoz on cross-examination:

"[Prosecutor]: Did you hear Mr. Rodriguez talk about the existence of an association among a group of people from Oceano?

"[Munoz]: Yes, I did.

"[Prosecutor]: Are you in that association?

"[Munoz]: No, I'm not.

"[Prosecutor]: Did you hear him testify that you were?

"[Munoz]: No."

---

[2]The district attorney made no offer of proof to overcome the court's initial and sound concern "Are you prepared to have any back-up evidence . . .?" Mr. La Barbera (Dist. Atty.): "I don't think we would get anybody to come in and testify [to gang membership]."

As a general proposition of law, a *witness* may be impeached by a showing of relationship to a *party* that reflects the witness' bias or prejudice. (Jefferson, Cal. Evidence Benchbook (1972) § 28.8, p. 458; 2 Wharton Criminal Evidence (13th ed. 1972) § 464, p. 405; Evid. Code, § 780, subd. (f); *People* v. *James* (1976) 56 Cal.App.3d 876, 886 [128 Cal.Rptr. 733].) And it has been held it is permissible to show a relationship, fraternal or otherwise exists between the witness and the party in whose behalf he is called as tending to affect his credibility. (*People* v. *Pickens* (1923) 61 Cal.App. 405, 408 [214 P. 1027].) However, there are foundational requirements to be met before such evidence becomes relevant and admissible.

As was said in *Pickens, supra,* 61 Cal.App. 405: "*[T]he fact of Stone's membership in the Ku Klux Klan without any proof that the witnesses whom it was sought to show were biased thereby had any knowledge of his being a member was clearly irrelevant to the issue.* . . . The range of external circumstances from which probable bias may reasonably be inferred is too great for legal limitation, but the reason for admitting evidence of bias and interest is that the existence of such emotions renders the witness untrustworthy. *It is self-evident, in order that one may be influenced by an emotion due to some circumstance such relationship, the person thus affected must have had knowledge of the fact.*" (*Id.,* at pp. 408-409; italics added.) (See also *Austin* v. *United States* (D.C. Cir. 1969) 418 F.2d 456, 459-460.)

In *In re Wing Y.* (1977) 67 Cal.App.3d 69, 77 [136 Cal.Rptr. 390], the trial court admitted evidence that seven boys were members of a Chinese youth gang (Wah Ching) over irrelevancy objection on the theory a common membership with the minor showed *bias* of the *witness.* The court held: "Thus, the prosecution in the instant case properly could inquire of witnesses Sammy Lee and Kenny Tam, called by the minor Wing, regarding their friendship with Wing, including their common group membership, as a means of attacking their credibility as witnesses, by establishing a bias in favor of the minor. *However, at that point the inquiry into Wah Ching should have ended.*" (*Id.,* at pp. 76-77; italics added.)

In an attempt to impeach the credibility of the defendant's alibi witnesses by showing bias, the People in *In re Wing Y., supra,* 67 Cal.App.3d 69, called a police officer who testified the defendant and his alibi witnesses were reputed in the Chinatown community of Los Angeles to be members of the "Wah Ching" gang. The Court of Appeal held *the trial court erred in overruling the defendant's hearsay objection to this reputation evidence.* "Officer Lou was competent to testify as to the membership in the Wah Ching gang of Lee, Tam and the minor Wing, *but only from personal knowledge.* Thus, Evidence Code section 702, subdivision (a), provides that, un-

less the matter pertains to the subject of expert testimony, 'the testimony of a witness concerning a particular matter is *inadmissible* unless he has *personal knowledge* of the matter. *Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter.*' '" (*Id.*, at p. 78; italics added.)

The trial court erred in permitting cross-examination of the defense witnesses about membership in the Pee Wee Locos or Oceano Trece without first showing the witnesses' competence (personal knowledge) or without other proper foundation.

Error No. 3

While recognizing group membership is a valid basis for showing bias, *In re Wing Y.* does not address all the problems here presented. The objection is not just *hearsay, irrelevancy or lack of foundation, but also Evidence Code section 352 was urged.* Furthermore, not just witnesses were cross-questioned but Munoz, the defendant, was also questioned concerning "club" membership.

When a *defendant/witness* is cross-examined on the ever present issue of *veracity,* the justification for gang membership questions found in *In re Wing Y., supra,* 67 Cal.App.3d 69, is totally absent. *Gang membership is not then relevant unless "the affairs of such an organization are . . . in issue."* (2 Wharton, Criminal Evidence, *supra,* p. 405; italics added.)

In *People* v. *Perez* (1981) 114 Cal.App.3d 470 [170 Cal.Rptr. 619] (hg. den. Supreme Ct. Mar. 11, 1981) applied this rule to *any* evidence concerning gang membership of the *defendant* unless shown to be *relevant* to some issue in the case.[3]

In *Perez,* the People argued defendant's membership in the "CV3" gang was relevant to an issue at trial. The court responded: "We agree with this basic proposition and state at the outset that evidence of gang membership is not per se inadmissible. *In order to be admissible it must meet the test of relevancy.*

"*. . . . . . . . . . . . . . . . . . . .*

"*The asserted active membership in the 'CV3' gang by defendant, as testified to by Deputy Valdemar, did not have any 'tendency in reason' to*

---

[3]*People* v. *Perez* is also cited with approval in the *dissent* of *People* v. *Cardenas, supra,* 31 Cal.3d 897.

*prove a disputed fact, i.e., the identity of the person who committed the charged offense. Membership in an organization does not lead reasonably to any inference as to the conduct of a member on a given occasion. Hence, the evidence was not relevant. It allowed, on the contrary, unreasonable inferences to be made by the trier of fact that the defendant was guilty of the offense charged on the theory of 'guilt by association.'* [Citation.]" (*Perez,* 114 Cal.App.3d at p. 477.)

In *People* v. *Szeto* (1981) 29 Cal.3d 20, 27-28 [171 Cal.Rptr. 652, 623 P.2d 213], this principle was applied when gang membership in the "Joe Boys" gang was used to prove a *motive* to gain revenge on another Chinese youth gang for the slaying of one Joe Boys gang member. (*Ibid.*) Thus in *Szeto* the affairs of the organization were in issue; therefore gang membership of defendant was relevant.[4] (See also *People* v. *Frausto* (1982) 135 Cal.App.3d 129 [185 Cal.Rptr. 314].)

The People have made no showing whatsoever the "club" membership of Munoz tended to prove or disprove any issue in the case. No offer of proof or any attempt to lay a foundation showing relevancy preceded the improper questioning. No hint of relevance is presented to this court.

The admission of *irrelevant* evidence is not left to the sound discretion of the trial judge. "*[I]f evidence is irrelevant, it must be excluded. The trial judge has no discretion to admit irrelevant evidence.*" (*People* v. *Slone* (1978) 76 Cal.App.3d 611, 631 [143 Cal.Rptr. 61]; italics added; *People* v. *Hall* (1980) 28 Cal.3d 143, 152 [167 Cal.Rptr. 844, 616 P.2d 826].) What disputed fact or issue is proved or disproved by evidence of Munoz' gang membership? None is tendered; none is conceived. The trial court erred in permitting any questions as to Munoz' "club" membership.

### Error No. 4

Further error was committed in the cross-examination of Munoz. It was observed in *People* v. *James, supra,* 56 Cal.App.3d 876, 887: "It is established law in California that, apart from matters affecting credibility, cross-examination of a witness is limited to the scope of the direct examination. (Evid. Code, § 773.) . . .

"*A defendant in a criminal case, however, may not be examined by a cross-examiner beyond the scope of the direct examination. (Evid. Code,*

---

[4]The difficult problem in *Szeto* was the mode of *proof* of gang membership. A divided Supreme Court held admissible opinion (hearsay) testimony absent a timely objection. The plurality opinion three to one to two leaves this issue unresolved.

§ *772, subd. (d).*) *The basis of this limitation on the cross-examination of a defendant in a criminal case is the constitutional privilege against self-incrimination. To permit the prosecutor to exceed the scope of the direct examination in examining a criminal defendant would amount to forcing such defendant to become the prosecution's witness.* [Citation.]" (See also *People* v. *Collie,* 30 Cal.3d 43, 55; *People* v. *Bagwell,* 38 Cal.App.3d 127, 140; hg. den. Apr. 17, 1979); Evid. Code, § 773, subd. (a); *People* v. *Schader,* 71 Cal.2d 761, 769.) Gang or club membership of the defendant does not, as in the case of a witness, tend to show a relationship contributing to bias in favor of the party on whose behalf the witness is called. The cross-examination here was clearly beyond the scope of direct testimony. It was aptly described by the trial judge as "probing and fishing to see what answers you get"—on an irrelevant issue.

### Error No. 5

Munoz also objected on Evidence Code section 352 grounds—the evidence lacked probative force and was unduly prejudicial.

In *People* v. *Cardenas, supra,* 31 Cal.3d 897, 904, the long-recognized rule was repeated: "When a section 352 objection is raised, the trial court '*must weigh* the admission of [the challenged] evidence carefully in terms of whether the probative value of the evidence is greater than the potentially prejudicial effect its admission would have on the defense.' [Citation.] If the prejudicial effect outweighs the probative value, the trial court should exclude the evidence. '[T]he fundamental rule [is] that relevant evidence whose probative value is outweighed by its prejudicial effect should not be admitted.' [Citation.]" (Italics added.) (See also *People* v. *Green* (1980) 27 Cal.3d 1, 24 [164 Cal.Rptr. 1, 609 P.2d 468].)

By his objection Munoz "specifically invoked the discretion vested in the court by Evidence Code section 352 to exclude otherwise relevant evidence 'if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . .'" (*People* v. *Green, supra,* 27 Cal.3d 1, 24.)

The trial court here made no such mandated evaluation. Concerning such a failure, the Supreme Court in *People* v. *Green, supra,* said (at p. 24): "As defendant correctly points out, the record does not show that the court did in fact discharge its statutory duty in these circumstances by weighing the statement's potential for prejudice against its probative value and concluding that the latter was not 'substantially outweighed' by the former. Instead, the court simply ruled that it would deny defendant's motion and would admit the statement with a limiting admonition to the jury." Said the

Supreme Court (at p. 25): "The Attorney General responds that the record in the case at bar does not contain a similar affirmative showing that the trial court misunderstood its duty to weigh prejudice against probative value; *here the record is simply silent on the point, and the Attorney General implies that in such event it should be assumed the court knew and performed its duty. The argument is untenable*: . . . . Moreover, since the enactment of section 352 the *Ford* [*People* v. *Ford,* 60 Cal.2d 772, 801] requirement—i.e., that on a motion invoking this ground the *record must affirmatively show that the trial judge did in fact weigh prejudice against probative value*—has been reiterated both by the courts [citation] and by the writers [citation]." (Italics added; fn. omitted.)

The probative value of Munoz' gang membership (if it were a fact) was zero for *it did not in any way connect the defendant with the crime* itself. (See *In re Ricky B.* (1978) 82 Cal.App.3d 106, 111 [146 Cal.Rptr. 828].) Membership in the Pee Wee Locos or Oceano Trece does not have any "tendency in reason" to prove the disputed fact, i.e., the identity of the person who committed the murder. As was said in *People* v. *Perez, supra,* 114 Cal.App.3d 470, 477: "Membership in an organization does not lead reasonably to any inference as to the conduct of a member on a given occasion. Hence, the evidence was not relevant. It allowed, on the contrary, unreasonable inferences to be made by the trier of fact that the defendant was guilty of the offense charged on the theory of 'guilt by association.' [Citation.]" Evidence is *not* admissible to show a defendant's criminal propensity or bad character as the means of raising an inference the defendant committed the charged crime. (*People* v. *Sam* (1969) 71 Cal.2d 194, 206 [77 Cal.Rptr. 804, 454 P.2d 700].)

Thus not only does the evidence lack any probative value, the danger of undue prejudice was great. In less violent times, an appellate court could observe that evidence a youthful Hispanic was a member of a youth gang was not prejudicial. (See *People* v. *Zammora,* 66 Cal.App.2d 166, 214.) But as pointed out in *People* v. *Perez, supra,* 114 Cal.App.3d at page 479: "*Zammora* was decided in 1944. In the decision on page 215 it states 'it seems only reasonable to assume that the use of the word "gang" referred only to the usual and ordinary crowd of young people living in any particular neighborhood, who associate themselves together, and from time immemorial has been referred to as a "gang."' Thirty-six years have passed since *Zammora.* It is fair to say that when the word 'gang' is used in Los Angeles County, one does not have visions of the characters from the 'Our Little Gang' series. The word gang as used in the case at bench connotes opprobrious implications."

The Supreme Court in *People* v. *Cardenas, supra,* 31 Cal.3d 897, 905, accepted the *Perez* reasoning, saying: "[T]he jury would improperly infer

that appellant had a criminal disposition because (1) the El Monte Flores was a youth gang, (2) such gangs commit criminal acts; and (3) appellant was a member of the Flores gang.''

The conclusion is inevitable. The gang membership questioning constituted not just an abuse of discretion; it was in direct contravention of multiple statutory and judicially decided rules of evidence.

## III

The majority opinion avoids the reasoning and rule of *People* v. *Cardenas, supra,* 31 Cal.3d 897. In *Cardenas,* as here, the prosecutor did not specifically refer to the group as a "gang," but the Supreme Court observed the jury "undoubtedly identified the group as [a gang] either from their personal knowledge or from their in-court observations of the witnesses' age, ethnicity, and tattoos." (*Id.,* at p. 905.) Other testimony already established Cardenas and defense witnesses were friends and lived in the same neighborhood. The Supreme Court held the inquiries into group (gang) affiliations were unnecessary, cumulative, and prejudicial, notwithstanding the prosecutor's theory the evidence was offered to establish possible bias of the witnesses in favor of the defendant. (*Id.,* at pp. 904-905.) " '[T]he prosecution has no right to present *cumulative* evidence which creates a substantial danger of undue prejudice to the defendant.' '' (*Id.,* at p. 905; italics added.)

*Cardenas* holds there is no per se rule for exclusion of gang membership evidence. Rather, the Supreme Court cites *People* v. *Perez, supra,* 114 Cal.App.3d 470, 478, for the application of the long-established Evidence Code section 352 duties imposed upon a trial judge to weigh and evaluate proffered evidence. The probative value must be weighed against the potentially prejudicial effect. Finally, *Cardenas* declares evidence of membership in a Chicano youth gang in Southern California in 1981 could cause the jury to improperly infer the defendant has a criminal disposition.

We confront that same issue as divided the *Cardenas* court. Was the erroneous admission of the "club" membership testimony "harmless error"? While not binding precedent the *Cardenas* plurality gives some guidance on the harmless error issue, for Munoz' case is factually akin to *Cardenas* in many aspects.

The key "disputed fact" in this prosecution (and *Cardenas*) was the identity of the killer. Here, as in *Cardenas,* there was no showing the crime was gang related or that "club" membership gave any hint of the killer's identity. Evidence of gang membership from the *witnesses* was (if admis-

sible) at best circumstantial evidence of bias. Evidence of gang membership was simply not relevant to and not within the scope of Munoz' testimony.

This was a very close case factually in which the jury was required to choose between Munoz' alibi supported by several witnesses and Ramirez' varied past and present versions of the shooting and his multiple confessions to unimpeached third persons. Corroboration of Ramirez' testimony connecting Munoz with an "act or fact which is an element of the crime" cannot be found in this record. Thus, credibility was all important. "*Certainly a substantial showing of probative* [italics ours] value was required to justify admission of this prejudicial . . . evidence so that the jury could dispassionately perform its function of ascertaining the truth as to the events involved in *this* case." (*People* v. *Sam,* 71 Cal.2d 194, 206.) The jury deliberated some 12 hours. In *Cardenas* the jury's 12 hours of deliberation was a "graphic demonstration" the case was close. (*Id.,* at p. 907.) The *Cardenas* court noted deliberations longer than six hours have been held to show the issue of guilt is not "open and shut." (*Ibid.*)

The conclusion is inescapable. The trial court's rulings constituted an abuse of discretion. The gang membership questions for at least five good and sufficient reasons should have been excluded. The effect of these errors must next be examined in light of the "harmless error" rule.

## IV

Under the rule of *Donaldson* v. *Superior Court, supra,* 35 Cal.3d 24, 28-34, Munoz' secretly recorded jail house telephone conversations with visitor Aurora Galvan were admissible. (This surreptitiously recorded conversation, along with a transcript, was in fact admitted without objection.) On this tape, Munoz and Galvan discussed their activities the day and night of the murder. At least one reasonable inference to be drawn from the conversation was that Munoz was coaching Galvan to be an alibi witness on his behalf. This is one of the two weak reeds that gives rise to an inference of guilt that supports the Ramirez evidence.

## V

Under direction of the Supreme Court in *Donaldson,* the Galvan discourse are admissible, yet even more egregious errors occurred in the admission of the tapes and recording of Munoz' police car conversations. (See Majority opn., *ante,* fn. 3, pp. 1016, 1017.) Three days after being arrested for the Klima murder, Munoz, together with Ramirez and Raul Galvan were placed in the back of a police patrol car and their conversation recorded by a concealed tape recorder. Munoz had not yet been arraigned. He was told

he was to be transported to the municipal court for *arraignment*. The record of that court shows no arraignment proceedings set or held on that day. The three were transported to the courthouse, left alone in the patrol car for three-quarters of an hour, where their conversations were surreptitiously taped, then returned to the jail. Munoz was not arraigned until *nine* days after his arrest (May 22, 1980). That Munoz knew Ramirez had already talked to the police, had pointed the finger of guilt at Munoz, and was bargaining for leniency may be inferred from the conversation.

A tape and transcript of this conversation were admitted into evidence at trial over defense objections based on violation of defendant's privacy and Fifth Amendment rights. Munoz also claimed the tape was inaudible and the transcript inaccurate, and under Evidence Code section 352, the prejudicial effect outweighed the probative value of the evidence. At the preliminary hearing, the tape was admitted by *stipulation.*

We confront here pretrial detainees not held within the jail walls, yet are in police custody. The *De Lancie* (*De Lancie v. Superior Court* (1980) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142])—no surreptitious monitoring except for security reasons—rule was expressly declared to extend, not only to conversations between detainees and visitors but also to communications between detainees. Section 2600 expressly grants rights to "a *person sentenced to imprisonment in a state prison.*" (Italics added.) There is no restriction limiting the exercise of these rights to any particular specie of custody or place within the prison. In short the rights, by the plain unambiguous language of the statutes, are granted to the *person* not to a *place.* These are the prisoner's *personal* rights. These rights adhere to the individual, subject only to such limitation as may be necessary to provide for the reasonable security of the institution and the protection of the public.

This construction is supported by interpretations of the Fourth Amendment to the federal Constitution. (See *Katz v. United States* (1967) 389 U.S. 347, 353 [19 L.Ed.2d 576, 583, 88 S.Ct. 507].) The "Fourth Amendment protects people not places" (*Katz, supra,* at p. 351 [19 L.Ed.2d at p. 582]) as does article I, section 1 of the California Constitution. The "uninvited ear" rule, resting on the Fourth Amendment, applies to persons whether in taxicabs, telephone booths or wherever. The equal protection reasoning of *De Lancie* should apply to pretrial detainees while being transported in a police patrol car to the court building for arraignment just as it does to detainees held in the jail house holding tank, cells, exercise yard, jail hospital or booking area.

## VI

*De Lancie* followed the well-established principle a court should avoid resolving an issue on constitutional grounds if the case can be decided upon

statutory premises. (See fn. 12, 31 Cal.3d at p. 877, *De Lancie.*) I agree with this approach. However, the facts here compel, relative to the recorded police car conversations, a consideration of police violations of the Fourth, Sixth and Fourteenth Amendments to the federal Constitution. Ramirez at the time of these conversations had just made a bargain with the prosecution to testify against Munoz. Most recent United States Supreme Court decisions require a factual inquiry into *whether Ramirez, at the time the patrol car tape was made, was acting on behalf of the police. (United States v. Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115 100 S.Ct. 2183]; *Rhode Island v. Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682, 1689]; and *Massiah v. United States* (1964) 377 U.S. 201, 206 [12 L.Ed.2d 246, 250, 84 S.Ct. 1199].)

In *Henry,* the government's use of a paid informant, who ostensibly was a fellow inmate, was held to render incriminating statements "deliberately elicited" from Henry by the informant *inadmissible as violative of the Sixth Amendment right to counsel.* In *Henry,* the informant "deliberately used his position to secure incriminating information from Henry when counsel was not present . . . ." (*Henry,* 447 U.S. at p. 270 [65 L.Ed.2d at p. 122].)[5]

In *Massiah, supra,* 377 U.S. 201, the government outfitted an informant's automobile with radio transmitting equipment and instructed the informant to engage the defendant in conversations relating to the crime. The statements were suppressed. The court held that the Sixth Amendment *must apply to indirect and surreptitious interrogations as well as those conducted at the jail house. (Massiah,* at p. 206 [12 L.Ed.2d at p. 250].)

The police car taping here was conducted three days after Munoz' arrest and after Ramirez had agreed to cooperate with the police. The United States Supreme Court admonished us that such arranged confrontation must be scrutinized carefully to determine whether a police "agent" was involved and whether this involvement occurred at a critical stage of the prosecution to which the Sixth Amendment right to assistance of counsel attaches. (See *United States v. Henry, supra,* 447 U.S. at p. 270 [65 L.Ed.2d at p. 122].)

---

[5]The United States Supreme Court distinguished prearrest investigation: "It is quite a different matter when the Government uses undercover agents to obtain incriminating statements from persons not in custody but suspected of criminal activity prior to the time charges are filed." (*Henry,* at p. 272 [65 L.Ed.2d at p. 123].) The Fourth Amendment does not protect a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. (See *Hoffa v. United States* (1966) 385 U.S. 293, 302 [17 L.Ed.2d 374, 382, 87 S.Ct. 408, 413.].) The Fifth Amendment is not implicated by the use of undercover agents before charges are filed. As the *Henry* court noted: "[T]he Fourth and Fifth Amendment claims made in those cases are not relevant to the inquiry under the Sixth Amendment here—whether the Government has interfered with the right to counsel of the accused by 'deliberately eliciting' incriminating statements." (*Henry,* 447 U.S. at p. 272 [65 L.Ed.2d at p. 123].)

Munoz at the time of the police car bugging had not been arraigned; no charges were yet lodged against him. He had been held three days (May 13 to May 16) in violation of statute and constitutional provisions, without being taken before a magistrate.[6] Munoz was not in fact arraigned until nine days after his arrest.

This failure to promptly arraign Munoz necessarily interfered with his fundamental right to liberty. He was denied a meaningful opportunity to obtain counsel, post bail or be released on his own recognizance. (*Van Atta v. Scott* (1980) 27 Cal.3d 424, 431 [166 Cal.Rptr. 149, 613 P.2d 210].) Notice of right to counsel and counsel's availability may await the arraignment process. Violation of the prompt arraignment rule of Penal Code section 825 also constitutes an unnecessary and unreasonably prolonged detention in contravention of article I, section 14 of the California Constitution which requires that a person accused of a felony " 'be taken without unnecessary delay before a magistrate.' " (*People v. Thompson* (1980) 27 Cal.3d 303, 329 [165 Cal.Rptr. 289, 611 P.2d 883].)

The more critical question is what sanctions are to be imposed for this breach of official duty.

As was stated in *People v. Thompson, supra,* (27 Cal.3d at pp. 329-330): "[E]ven if a confession occurs during a period of illegal detention under section 825, that fact alone does not render it inadmissible. A delay in arraignment is treated 'as only one of the factors to be considered in determining whether the statement was voluntarily made.' [Citations.] To exclude the statement, the defendant must show that 'the illegal detention produced the admissions' or that there was an 'essential connection between the illegal detention and the confession.' [Citations.]"

The Supreme Court in *People v. Pettingill* (1978) 21 Cal.3d 231, 244 [145 Cal.Rptr. 861, 578 P.2d 108], held: "*The principal purposes of the requirement of prompt arraignment are to prevent secret police interrogation, to place the issue of probable cause for the arrest before a judicial officer, to provide the defendant with full advice as to his rights and an opportunity to have counsel appointed, and to enable him to apply for bail or for habeas corpus when necessary.*

"It follows that the failure of the police to cease all *attempts at interrogation of defendant herein after he refused to waive his right to remain*

---

[6]In *People v. Powell* (1967) 67 Cal.2d 32, 59 [59 Cal.Rptr. 817, 429 P.2d 137], the Supreme Court interpreted Penal Code section 825: " 'The defendant must in all cases be taken before the magistrate without unnecessary delay, and in any event, *within two days after his arrest* . . . .' " Said the Supreme Court: "[S]ection 825 does not authorize even a two-day detention in all cases . . . ." (*Ibid.*)

*silent was not cured by their subsequent failure to comply with the laws requiring his prompt arraignment. Two such wrongs do not make a right; they remain separate abuses, compounding the infringement of defendant's privilege against self-incrimination."* (Italics added.)

Thus the failure to comply with Penal Code section 825 and article I, section 14 of the California Constitution may have prevented Munoz' exercise of his Sixth Amendment right to counsel. Thus the one statutory and state constitutional wrong—delayed arraignment—produced a greater, more profound federal constitutional wrong—if Ramirez' activities and purpose falls within the *Henry-Innis-Massiah* prohibition.

These tapes—from the jail house and the police car—were admitted with the foregoing unresolved factual, statutory, and constitutional issues. Even assuming substantial evidence supports the conviction, a retrial is required under *De Lancie.* The jail house tape, to be admissible, must be shown to have been recorded for security purposes. Retrial would be required by *Henry* for this reason also and additionally for inquiry into whether Ramirez was a police agent as he sat in the patrol car and deliberately elicited statements from Munoz in violation of the rule of *Massiah* v. *United States, supra,* 377 U.S. 201.

### VII

The erroneously admitted "gang" member evidence should be assessed for reversible error under the *Watson* rule. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) However, the erroneous admission of the tape recordings of a pretrial detainee held in violation of prompt arraignment rules presses upon statutory, as well as state and federal constitutional nerves. Federal constitutional error requires reversal if this court is unable to declare its belief that the errors were harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

Whether the test is "harmless" error under *Watson* or *Chapman* rules, the result is the same. The case against Munoz rests entirely on the believability of Ramirez—a witness who is patently vulnerable to charges of mendacity, bias, prejudice, self-interest and multiple contradictions by several witnesses. The corroboration of Ramirez' story, if admissible, is weak to nonexistent.

In a remarkably similar case, the Supreme Court in *People* v. *Green, supra,* 27 Cal.3d 1, 71-73, was influenced by the fact the conviction rested

on the dubious testimony of a cosuspect. "Our doubt in the matter is enhanced by the particular facts of the case at bar. . . .

". . . . . . . . . . . . . . . . . . . . . . . . .

"[A]ll that evidence came from a single source—the testimony of David Khan—cannot have inspired much confidence. Not only did Kahn's testimony on these points remain wholly uncorroborated, but on both direct and cross-examination his credibility was thrown into serious question. Thus on direct examination he admitted that he repeatedly lied to the authorities in the days following his arrest. On cross-examination Khan conceded that he changed his story and began accusing defendant of the crime when the authorities told him that he would be charged with the murder himself. He acknowledged that during the trial he was in custody for his own protection and had been promised by the authorities that as soon as the trial was over he would be 'placed,' i.e., he would be provided with a place to live of his own choosing." (*People* v. *Green, supra,* 71-72; fn. omitted.)

## VIII

Finally, there is not one but multiple errors in the admission of critical evidence. There is no litmus test to indicate whether the jury convicted on the basis of admissible or inadmissible evidence. Therefore the judgment must be reversed. In *People* v. *Robinson* (1964) 61 Cal.2d 373, 406 [38 Cal.Rptr. 890, 392 P.2d 970], the Supreme Court said: "*When, as in this instance, a reviewing court is unable to determine from the record whether a jury convicted on admissible evidence or rejected that evidence and convicted on inadmissible evidence improperly received, it must find the error to have been prejudicial.* Under a different factual situation, but where the principle was equally applicable, this court said: 'However reprehensible the conduct of an accused, he is entitled to have its legal consequences determined from competent evidence by a jury properly instructed. Here, we cannot fairly say that, had the improper evidence improperly used not been before the jury, unadvised of its impropriety, the verdict and sentence would have been the same.' [Citation.]" (To the same effect see *People* v. *Green, supra,* 27 Cal.3d 1, 69.) The *Robinson-Green* rule requires reversal if any *one of the several areas of evidence complained of is found to be inadmissible and it cannot be determined whether the jury convicted on admissible evidence or on inadmissible evidence improperly received.* The cumulative prejudice resulting from the erroneous evidentiary rulings may require reversal. (*Cardenas, supra,* 31 Cal.3d at p. 907.) Reversal is also necessary when it cannot be said the combined errors were harmless beyond reasonable doubt. (*In re Rodriguez* (1981) 119 Cal.App.3d 457, 470 [174 Cal.Rptr. 67].)

## IX

In his habeas corpus petition, Munoz charges trial counsel with ineffectiveness. The majority resolution of this issue cannot be faulted.

I would reverse the judgment.

Appellant's petition for a hearing by the Supreme Court was denied September 26, 1984.