Filed 3/16/15

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHAQUILLE KASIYA JORDAN et al.,<br><br>    Defendants and Appellants. | D064010<br><br><br><br>(Super. Ct. No. SCD234048) |

APPEAL from a judgment of the Superior Court of San Diego County, Kerry Wells, Judge. Affirmed as modified.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant Shaquille Kasiya Jordan.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant Seandell Lee Jones.

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part II., sections A., B., D. and E.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant Rashon Jay Abernathy.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

Based on a robbery and killing that occurred on May 11, 2011, when each of the defendants was 17 years old, Rashon Jay Abernathy, Seandell Lee Dupree Jones and Shaquille Kasiya Jordan (collectively, defendants) were found guilty of first degree murder (Pen. Code, §§ 187, subd. (a), 189);[1] two counts of robbery (§ 211); shooting at an occupied motor vehicle (§ 246); and unlawfully taking and driving a vehicle (Veh. Code, § 10851, subd. (a)). Based on a different incident on May 5, 2011, the jury also found Abernathy guilty of an additional count of robbery (§ 211). The jury made true findings that Abernathy personally used a firearm during the robberies, the murder and the shooting at an occupied vehicle. (§ 12022.53, subds. (b), (d).)

The trial court sentenced Jones and Jordan to a prison term of 25 years to life and sentenced Abernathy to a prison term of 50 years to life.

On appeal, all three defendants contend that (1) the trial court prejudicially erred in failing to instruct that, for the purposes of the felony-murder rule, the jury must find that the target felony (robbery) ended at the point defendants reached a place of temporary safety, known as "the escape rule"; (2) the sentences imposed by the trial court

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

2

are unconstitutional under either the federal or state Constitutions because they constitute cruel and unusual punishment; and (3) at sentencing, the trial court incorrectly calculated the defendants' presentence custody credits. Jones and Abernathy further contend insufficient evidence supports their convictions for unlawfully taking or driving a vehicle, and Jones contends the abstract of judgment does not accurately reflect that his five-year sentence for shooting at an occupied vehicle in count 4 was stayed by the trial court pursuant to section 654.

We conclude that (1) although the trial court erred in failing to instruct with the escape rule for felony murder, the error was not prejudicial; (2) sufficient evidence supports Abernathy's and Jones's conviction for unlawfully taking or driving a vehicle; (3) there is no merit to the defendants' contention that their sentences constitute cruel and unusual punishment; (4) Abernathy's and Jordan's judgment should be modified to award an additional day of presentence custody credit; and (5) a clerical error in Jones's abstract of judgment must be corrected to reflect that the sentence on count 4 is stayed pursuant to section 654. Accordingly, we modify the judgment as to Abernathy and Jordan to award an additional day of presentence custody credit, and we order that the abstract of judgment be corrected as to Jones to accurately reflect that his sentence on count 4 is stayed. In all other respects, the judgments are affirmed.

I

FACTUAL AND PROCEDURAL BACKGROUND

In May 2011, Abernathy placed an advertisement on Craigslist claiming that he had a MacBook Pro computer to sell for $900. After Abernathy communicated with a

3

potential buyer, Erick Castillo, by exchanging text messages, Abernathy met with Castillo at a recreation center on May 5, 2011. Abernathy brought along a friend for the transaction, but the other two defendants were not involved. When Castillo took out $600 in cash to pay for the computer, Abernathy's friend grabbed the money and ran away with Abernathy. Castillo chased them, and as Castillo came closer, Abernathy pulled out a gun and pointed it at Castillo, stating "I'm going to fucking kill you." Castillo gave up the chase and called 911.

A second robbery occurred on May 11, 2011, and involved Abernathy, Jones and Jordan. Using the same Craigslist advertisement, Abernathy arranged to meet with 18-year-old Garrett Berki in front of a school around 9:15 p.m. Berki brought his girlfriend, Alejandra Faudoa, along in the car for the transaction. After waiting in front of the school for a few minutes, Berki got a call from Abernathy stating that the meeting place had changed to an apartment complex in the neighborhood. Berki drove to the new location, where Abernathy and Jones were waiting outside. Abernathy insisted that Berki show him the money before handing over the computer. During the discussion, Jones either showed Berki a gun or pointed it at him, stating that Abernathy would count the money. Berki handed over the money, and Abernathy demanded that Berki and Faudoa give him their cell phones. Abernathy and Jones then ran away through the apartment complex with a total of $640 and the two cell phones.

According to Abernathy, he got to the scene of the May 11 robbery after being picked up from home in a Honda driven by Jordan, in which Jones was a passenger. Jordan parked near the apartment complex and dropped off Abernathy and Jones so that

4

they could commit the robbery. After the robbery Abernathy and Jones ran back to the Honda, and the three defendants decided to go to a nearby house where Jones's and Jordan's girlfriends lived. According to Abernathy, they stayed at the house for a few minutes but then were asked to leave, so they started driving toward a shopping mall.

Meanwhile, after being robbed, Berki and Faudoa sat in their car for a few minutes before deciding that Berki would drive to the police station to report the robbery. When Berki had driven one or two blocks from the scene of the robbery, he noticed Jordan, Jones and Abernathy in the Honda driving toward him. Berki and Faudoa decided to follow the Honda so that they could get the license plate number. Berki followed the Honda in and out of a parking lot and then through the streets and onto a freeway. Berki was driving close behind the Honda to try to see the license plate, and he was also driving in a manner that he hoped might attract the attention of the police, such as pulling directly in front of the Honda and putting on his brakes.

The Honda exited the freeway while Berki's car was in front of it, but Berki managed to drive over the freeway shoulder and down the off-ramp, following the Honda into a residential neighborhood. Both cars ended up on a dead-end street. Berki stopped his car at an angle before the end of the cul-de-sac while the Honda turned around at the end of the cul-de-sac and drove up next to Berki's car. Abernathy pointed a gun out of a backseat window of the Honda and fired one shot into Berki's car. Berki was shot in the left chest and was pronounced dead at the hospital a short time later.

The defendants drove a few blocks away, crashed the Honda and fled into the backyards of the residential neighborhood, where police located them by use of infrared

5

helicopter cameras and K-9 units. After being arrested, Jones, Jordan and Abernathy were taken to the police station, where they made numerous statements connecting themselves to the crimes in a recorded jail cell conversation. Further, it was discovered that the Honda in which the defendants were riding had been stolen a few hours before the second robbery, either on the night of May 10 or the morning of May 11, 2011.

Based on the events of May 11, 2011, Abernathy, Jones and Jordan were each charged with first degree murder (§§ 187, subd. (a), 189), two counts of robbery (§ 211), shooting at an occupied motor vehicle (§ 246); and unlawfully taking and driving a vehicle (Veh. Code, § 10851, subd. (a)). Based on the May 5, 2011 robbery, Abernathy was charged with an additional count of robbery (§ 211). The information also included gang allegations for each count as to each defendant (§ 186.22, subd. (b)(1)), and allegations as to each count (except the count for unlawfully taking or driving a vehicle) that a principal personally used a firearm in committing the crimes (§ 12022.53, subd. (b), (d), (e)(1)).

When Abernathy testified at trial, he admitted to committing both robberies and to shooting Berki, but he contended that the shooting was an accident caused by an inadvertent discharge of the gun. Abernathy also testified that he did not know that Jordan was driving a stolen vehicle until Jordan informed him of that fact when he got back into the Honda after the second robbery. Jordan and Jones did not testify at trial.

The jury found the defendants guilty on all counts but did not make a true finding on the gang allegations and found the firearm allegations to be true only as to Abernathy.

6

The trial court sentenced Jones and Jordan to prison for 25 years to life and sentenced

Abernathy to prison for 50 years to life.

II

DISCUSSION

A.      *The Error in Instructing the Jury on the Escape Rule for Felony Murder Was Harmless Beyond a Reasonable Doubt*

We first consider the contention, advanced by all three defendants, that the trial

court prejudicially erred in failing to instruct on the escape rule for felony murder.  There

is no dispute that the trial court erred.  Indeed, as the trial court acknowledged in ruling

on posttrial motions, our Supreme Court's opinion in *People v. Wilkins* (2013) 56 Cal.4th

333 (*Wilkins*) — issued *after* the verdict in this case — establishes that the trial court's

instruction on felony murder was incorrect.  However,  as we will explain, we agree with

the trial court's conclusion that the error was harmless because, based on the jury's

findings on other issues, it is clear beyond a reasonable doubt that the jury would have

reached the same verdict on the murder counts had it been properly instructed with the

escape rule for felony murder.

1.      *The Escape Rule as Applied to Felony Murder*

We first examine the applicable legal principles under the felony-murder rule.

Here, all three defendants were charged with murder under the felony-murder rule, based

on the allegation that Berki's death occurred during the commission of a robbery.[2]  Under

---

2       As the shooter, Abernathy was also prosecuted for first degree murder under two other theories identified in section 189, namely, (1) he killed willfully with premeditation

7

the felony-murder rule, "[a]ll murder . . . which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, [or] train wrecking . . . is murder of the first degree." (§ 189.) " 'Under the felony-murder rule, a strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the felony and murder were part of *one continuous transaction*.' " (*Wilkins*, *supra*, 56 Cal.4th at p. 340, italics added.)

Prior to our Supreme Court's recent opinion in *Wilkins*, the discussion in *People v. Cavitt* (2004) 33 Cal.4th 187 (*Cavitt*) created uncertainty about what constitutes one continuous transaction in the context of the felony-murder rule. Specifically, the uncertainty involved the issue of whether, in the context of felony murder, the target felony continues only until the perpetrator has reached a *place of temporary safety*, which is a concept referred to as "the escape rule." (See *Wilkins*, *supra*, 56 Cal.4th at pp. 341-342 [explaining uncertainty as to the application of the escape rule in a felony-murder context caused by *Cavitt*].) The escape rule is used in contexts other than felony murder to determine whether an act occurred in the commission of a crime, such as to determine whether a defendant used a firearm in commission of a crime, committed a kidnapping during a crime, or inflicted great bodily injury during a crime. (*Id*. at p. 341, citing cases.) CALCRIM No. 3261 accordingly sets forth the escape rule for use in those contexts. However, based on *Cavitt*, the bench notes to CALCRIM No. 3261 at the time of defendants' trial specifically *disapproved* instructing the jury on the escape rule in the

and deliberation, and (2) he intentionally discharged a firearm from a motor vehicle at another person outside of the vehicle with the intent to inflict death.

context of felony murder, stating that the instruction " 'should *not* be given in a felony-murder case to explain the required temporal connection between the felony and the killing.' " (*Wilkins*, at p. 341, citing (Judicial Council of Cal., Crim. Jury Instns. (2012) Bench Notes to CALCRIM No. 3261, p. 990.)[3]

Relying on *Cavitt* and the CALCRIM bench notes, the trial court here declined defendants' requests to instruct the jury with the escape rule for the felony-murder count. Under the instruction requested by defense counsel, but rejected by the trial court, the jury would have been informed that a robbery continues for the purpose of the felony-murder rule only until the perpetrators have reached a place of temporary safety. Instead, the trial court instructed the jury with a modified version of former CALCRIM No. 549, which set forth several nonexclusive factors for the jury to consider in determining whether a robbery and a murder constitute one continuous transaction for the purposes of the felony-murder rule.[4]

_____

[3]     As modified to apply to a robbery case, CALCRIM No. 3261 states in relevant part:
        "[The crime of robbery [or attempted robbery] continues until the perpetrator[s] (has/have) actually reached a place of temporary safety.
        The perpetrator[s] (has/have) reached a place of temporary safety if:
•       (He/She/They) (has/have) successfully escaped from the scene; [and]
•       (He/She/They) (is/are) not or (is/are) no longer being chased(; [and]/.)
•       [(He/She/They) (has/have) unchallenged possession of the property(; [and]/.)]
•       [(He/She/They) (is/are) no longer in continuous physical control of the person who is the target of the robbery.]]"

[4]     Former CALCRIM No. 549, as given by the trial court, stated:
        "A killing is committed during the commission of a robbery under the felony murder rule if the People have proved beyond a reasonable doubt that the robbery and the act causing death are part of one continuous transaction. The continuous transaction may

9

The trial here took place in October and November 2012.  In March 2013, before sentencing in this case, our Supreme Court decided *Wilkins*, *supra*, 56 Cal.4th 333.  In *Wilkins*, the Supreme Court explained that despite any uncertainty caused by *Cavitt*, the escape rule *does* apply in a felony-murder context, so that liability for felony murder ends at the point that the perpetrator reaches a place of temporary safety.  *Wilkins* stated, " 'Felony-murder liability continues throughout the flight of a perpetrator from the scene of a robbery *until the perpetrator reaches a place of temporary safety* because the robbery and the accidental death, in such a case, are parts of a "continuous transaction." ' . . .  When the killing occurs during flight, . . . the escape rule establishes the '*outer limits* of the "continuous-transaction" theory.' . . .  'Flight following a felony is considered part

occur over a period of time and in more than one location.  There is no requirement that the act causing death occur while committing or while engaged in the robbery or that the killing be part of the robbery, so long as the People have proved the two acts are part of one continuous transaction.

   "In deciding whether the killing and the robbery were part of one *continuous transaction*, you may consider the following factors:  [¶]  1. Whether the felony and the fatal act occurred at the same place;  [¶]  2. The time period, if any, between the robbery and the fatal act;  [¶]  3. Whether the fatal act was committed for the purpose of aiding the commission of the robbery or escape after the robbery;  [¶]  4. Whether the fatal act occurred after the felony but while one or more of the perpetrators continued to exercise control over the person who was the target of the felony;  [¶]  5. Whether the fatal act occurred while the perpetrators were fleeing from the scene of the robbery or otherwise trying to prevent the discovery or reporting of the crime;  [¶]  6. Whether the robbery was the direct cause of death;  [¶]  AND  [¶]  7. Whether the death was a natural and probable consequence of the robbery.

   "It is not required that the People prove any of these factors or any particular combination of these factors. This is not an exclusive list.  The factors are given to assist you in deciding whether the fatal act and the robbery were part of one continuous transaction."

of the same transaction *as long as the felon has not reached a "place of temporary safety."* ' " (*Id*. at p. 345, citations omitted, some italics added.)

Shortly after *Wilkins* was issued, the trial court notified the parties of the opinion and invited briefing. The defendants thereafter filed motions for a new trial based on *Wilkins*, arguing that the jury had been misinstructed on felony murder. In ruling on the motions, the trial court concluded that it *had* misinstructed the jury because it did not instruct with the escape rule for felony murder. However, the trial court concluded that the error was harmless beyond a reasonable doubt because the jury had been instructed with the escape rule as to the firearm allegations and the crime of shooting at an occupied vehicle. As the trial court explained, based on the jury's findings on those issues, the jury necessarily found that the defendants had not reached a place of temporary safety before Abernathy shot Berki, and thus, had the jury been properly instructed on the escape rule for felony murder, it would have found that the defendants had not reached a place of temporary safety before the killing.

2.      *The Error Was Harmless Beyond a Reasonable Doubt*

For the purposes of our analysis, we begin with the premise, as do the parties, that the trial court erred in failing to instruct the jury that the escape rule applies to the felony-murder counts. Specifically, after *Wilkins* it is clear that, with respect to felony murder, instead of instructing that the jury could find the robbery and the killing to be part of one continuous transaction based on several nonexclusive factors, including "[w]hether the fatal act occurred while the perpetrators were fleeing from the scene of the robbery or otherwise trying to prevent the discovery or reporting of the crime" (former CALCRIM

11

No. 549, as given), the jury should have been instructed that the robbery and the killing *could not* be part of one continuous transaction if the defendants reached a place of temporary safety before the killing.

The only disputed issue for us to resolve is whether the instructional error was prejudicial. *Wilkins* establishes that an error in failing to instruct the jury on the escape rule for felony murder is a federal constitutional error because the error amounts to a misinstruction on an element of first degree murder. (*Wilkins*, *supra*, 56 Cal.4th at p. 350.) Applying the standard of prejudice applicable to federal constitutional error, we therefore examine " 'whether it appears " ' "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " ' " (*Ibid.*)

An instructional error is harmless beyond a reasonable doubt if " '[t]he factual question posed by the omitted instruction was necessarily resolved adversely to defendant under other, properly given instructions.' " (*People v. Pulido* (1997) 15 Cal.4th 713, 726.) Here, as we will explain, the jury was instructed on the escape rule under two other instructions and necessarily made findings on the escape rule adverse to the defendants in connection with those instructions. Based on those findings, we can safely conclude that the jury determined the defendants had *not* reached a place of temporary safety before the killing.

First, we explain why the instructional error was harmless as to Jones and Jordan. Those two defendants were prosecuted for shooting at an occupied motor vehicle in count 4 under the sole theory that they were guilty as aiders and abettors under the natural and probable consequences doctrine. As the jury was instructed, for the natural and

12

probable consequences doctrine to apply, it must find that "[*d*]*uring the commission of*" the robbery, a coparticipant (i.e., Abernathy) committed the crime of shooting at an occupied motor vehicle, and that the shooting was a natural and probable consequence of the robbery.

The jury was further instructed to use the escape rule to determine whether the shooting occurred during the commission of the robbery for the purposes of the natural and probable consequences. Specifically, the jury was instructed with a modification of CALCRIM No. 3261, as follows: "For purposes of determining whether the crime of Shooting at an Occupied Vehicle was committed as a natural and probable consequence of robbery, the crime of robbery continues until the perpetrators have actually reached a temporary place of safety. [¶] The perpetrators have reached a temporary place of safety if: [¶] They have successfully escaped from the scene; [¶] They are no longer being chased; AND [¶] They have unchallenged possession of the property." Having been instructed with the modification of CALCRIM No. 3261, as quoted above, the jury found Jones and Jordan guilty of shooting at an occupied vehicle.

In light of the instruction on the escape rule in CALCRIM No. 3261, the jury could not have found Jones and Jordan guilty of shooting at an occupied vehicle unless it also found that the defendants had *not* reached a place of temporary safety before the shooting. Therefore, based on the jury's finding with respect to the natural and probable consequences doctrine for count 4, we can determine beyond a reasonable doubt what finding the jury would have made had it been properly instructed with the escape rule for felony murder. Specifically, based on the jury's verdict on the natural and probable

13

consequences doctrine for count 4, if properly instructed on the escape rule for felony murder, it is clear that the jury would have found that Jones and Jordan *did not* reach a place of temporary safety before the shooting, so that the robbery and the murder were part of one continuous transaction as required for a guilty verdict on felony murder. The instructional error in failing to instruct on the escape rule for felony murder was therefore harmless beyond a reasonable doubt as to Jones and Jordan.

Second, we explain why the instructional error was harmless as to Abernathy. The jury was instructed with the escape rule in the context of the firearm allegations against Abernathy. Specifically, Abernathy was alleged to have personally and intentionally discharged a firearm causing death while committing the May 11 robbery, the murder of Berki and while shooting at an occupied vehicle. (§ 12022.53, subd. (d).) As the jury was instructed, to make a true finding on those firearm allegations as to each crime, it had to find, among other things, that Abernathy "personally discharged a firearm *during the commission of that crime*." (Italics added.)

To help the jury determine whether Abernathy personally discharged a firearm during the crimes, the trial court instructed with a modification of CALCRIM No. 3261 that for the purposes of "Personally Using Firearm: Causing Death . . . , the crime of robbery continues until the perpetrators have actually reached a temporary place of safety. [¶] The perpetrators have reached a temporary place of safety if: [¶] They have successfully escaped from the scene; [¶] They are no longer being chased; AND [¶] They have unchallenged possession of the property."

14

The jury made a true finding that Abernathy personally and intentionally discharged a firearm during the robbery of Berki and Faudoa, during the murder of Berki and while committing the crime of shooting at an occupied vehicle. We know that the only time Abernathy personally discharged a firearm during the events of May 11 was when he shot Berki in the cul-de-sac after the car chase. Therefore, in concluding that Abernathy personally discharged a firearm during the robbery of Berki and Faudoa, the jury necessarily concluded that the robbery continued until the end of the car chase, when Abernathy shot Berki.[5]

In light of the instruction on the escape rule in CALCRIM No. 3261, the jury could not have found that the robbery continued until Abernathy shot Berki unless it also found that Abernathy did *not* reach a place of temporary safety before the shooting. We

---

[5]　Jordan and Jones argue that because the jury found the firearm allegations against them to be unproven, and the jury was instructed on the escape rule to determine whether a firearm was discharged during the commission of the crimes for the purposes of those firearm enhancements, the jury must have determined that the escape rule was not satisfied as to Jordan and Jones. The argument lacks merit. In contrast to the firearm allegations that the jury found to be true as to Abernathy for *personally* discharging a firearm under section 12022.53, subdivision (d), the only firearm enhancements alleged against Jordan and Jones were *gang-related* firearm enhancements, applicable to defendants who do not personally discharge a firearm, but who commit a gang-related crime together with the shooter. (§ 12022.53, subds. (d), (e)(1).) The jury was instructed that to make a true finding on the firearm allegations against Jordan and Jones as to each of the applicable counts, it was required to find that the defendants "committed those crimes for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further, or assist in any criminal conduct by gang members." The jury specifically found that the crimes were *not* gang related, requiring that they also find that the gang-related firearms allegations against Jordan and Jones were unproven. Therefore the jury's rejection of the firearm allegations against Jordan and Jones does *not* mean that the jury found that the escape rule was not satisfied as to them.

15

can therefore determine, beyond a reasonable doubt, based on the jury's true finding on the firearm allegations for the robbery counts, that if the jury had been properly instructed that the escape rule applied to felony murder, it would have concluded that Abernathy did *not* reach a place of temporary safety before the shooting. If properly instructed, the jury accordingly would have found that the robbery and the murder were part of one continuous transaction for the purposes of felony murder. The instructional error in failing to instruct on the escape rule for felony murder was therefore harmless beyond a reasonable doubt as to Abernathy as well.

The defendants argue that the instructional error was nevertheless prejudicial — even in light of the finding on the escape rule in the context of the natural and probable consequences doctrine for count 4 against Jones and Jordan and the firearm allegations against Abernathy — because the jury must have been confused by the different standards in former CALCRIM No. 549 and CALCRIM No. 3261 for determining whether the robbery continued until the shooting.[6] According to defendants, we cannot

---

[6] Defendants cite *Wilkin*'s statement, made in a slightly different context, that it could be "confusing or misleading" if a trial court instructed with both CALCRIM No. 3261 and former CALCRIM No. 549. (*Wilkins*, *supra*, 56 Cal.4th at p. 348, fn. 4.) Defendants' citation to *Wilkins* does not advance their argument. *Wilkins* posited that it would be confusing and misleading for trial courts to fashion an instruction on the escape rule for felony murder by giving both CALCRIM No. 3261 and former CALCRIM No. 549 together. Here, of course, both instructions were *not* given in an attempt to instruct on the escape rule for felony murder. Instead, the trial court gave both instructions because it concluded that the escape rule instruction in CALCRIM No. 3261 was warranted for the count of shooting at an occupied vehicle and the firearm allegations, and former CALCRIM No. 549, in contrast, was needed to explain the one continuous transaction doctrine for felony murder, and the distinction was made clear to the jury.

16

be certain that the jury properly applied the escape rule as described in CALCRIM No. 3261 because its analysis may have been tainted by the different standards set forth in former CALCRIM No. 549 for deciding whether the robbery and the shooting were one continuous transaction for the purpose of felony murder.

Based on our review of the record, we perceive no indication of any confusion caused by the fact that the jury was instructed with former CALCRIM No. 549 as well as CALCRIM No. 3261. We therefore perceive no problem with relying on the jury's findings as to the duration of the robbery in the context of the natural and probable consequences doctrine for count 4 and the firearm allegations in conducting our harmless error analysis. Indeed, during closing arguments the difference in the standards for determining the duration of the robbery as set forth in former CALCRIM No. 549 and CALCRIM No. 3261 was extensively explained to the jury, and that explanation would have dispelled any confusion that could have been caused by the conflicting standards in the two instructions.[7]

---

[7]    Specifically, during closing argument the prosecutor explained that the time frame involved in the question of whether the defendants had reached a place of temporary safety before the shooting is "different than the felony[-]murder one continuous transaction. This is what's known as the escape rule. It's going to sound similar because, again, you can use this as a factor to determine if it's one continuous transaction, but it is not the same thing." The prosecutor explained, "You can have the defendants reach a place of temporary safety and still have felony murder and still have one continuous transaction. They both can coexist." In his rebuttal argument, the prosecutor again returned to the contrast between the two instructions. "The jury instructions define robbery for you and how long this takes. For felony murder, it takes as long as the one continuous transaction doctrine. For natural and probable consequences and for gun usage, it takes as long as the escape rule says. The escape rule is not as long as the one continuous transaction. The one continuous transaction extends beyond the escape rule."

We accordingly conclude that the trial court's error in failing to instruct on the escape rule for felony murder was harmless beyond a reasonable doubt as to each of the defendants.

B.   *Sufficient Evidence Supports the Conviction for Unlawfully Taking or Driving a Vehicle Against Jones and Abernathy*

We next consider Jones's and Abernathy's argument that insufficient evidence supports their conviction in count 5 for unlawfully taking or driving a vehicle (Veh. Code, § 10851, subd. (a)).

All three defendants were convicted of violating Vehicle Code section 10851, subdivision (a), which provides:  "Any person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle, or any person who is a party or an accessory to or an accomplice in the driving or unauthorized taking or stealing, is guilty of a public offense . . . ."

As we have explained, the evidence established that the Honda being driven by Jordan on May 11, 2011, during the robbery and murder had been stolen while parked on the street sometime either late on May 10 or early on May 11.  Jordan, who was the

_____

Counsel for Jones also spent a considerable portion of his closing argument describing the two different instructions for determining the duration of the robbery.  Specifically, he described at length both the question of whether the defendants had reached a place of temporary safety for the purpose of the natural and probable consequences doctrine as well as the multi-factored test for determining in the context of felony murder whether the robbery and the shooting were part of one continuous transaction.

18

driver of the stolen Honda, does not challenge the sufficiency of the evidence to support his conviction for unlawfully taking or driving in violation of Vehicle Code section 10851, subdivision (a).

However, Jones and Abernathy contend that because they were *passengers* in the Honda, not the driver, and there is no evidence connecting them to the initial act of *stealing* the Honda, there is insufficient evidence to convict them under Vehicle Code section 10851, subdivision (a).

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60, citations omitted.)

We begin our analysis with a review of the applicable legal standards. As relevant here, Vehicle Code section 10851, subdivision (a) contains plain language establishing that criminal liability is not limited to the person who drives or steals a vehicle, but that it also extends to "any person who is *a party* or *an accessory to* or an *accomplice in* the driving or unauthorized taking or stealing." (*Ibid.*, italics added.) In *People v. Clark*

19

(1967) 251 Cal.App.2d 868, 874 (*Clark*), the court considered the extent to which a passenger in a stolen vehicle may be criminally liable under the portion of the statute applying to someone who is an accessory, an accomplice or a party to driving a stolen vehicle.  As *Clark* explained, establishing guilt under that theory "requires proof of more than mere presence in the automobile.  *At a minimum, defendant must have known that the vehicle had been unlawfully acquired and must have had that knowledge at a time when he could be said to have, in some way, aided or assisted in the driving*.  Knowledge of the unlawful taking, acquired after the ride started and when defendant could neither stop the trip nor leave the vehicle is not enough."  (*Ibid.*, italics added.)

Although sparse additional case law exists describing the circumstances in which a passenger in a stolen vehicle will be criminally liable for unlawfully driving the vehicle, case law in the analogous context of a passenger prosecuted for *receiving* a stolen vehicle under section 496 is instructive.  A conviction for receiving a stolen vehicle requires, among other things that the passenger have *actual or constructive possession* of the vehicle, even though the stolen vehicle is being driven by someone else.  (*People v. Land* (1994) 30 Cal.App.4th 220, 223 (*Land*).)  The question of whether a passenger in a stolen vehicle had constructive possession "turns on the unique factual circumstances of each case."  (*Id.* at p. 228.)  In *Land*, the evidence supported a finding that the passenger had constructive possession of the stolen vehicle because of the passenger's "close relationship to the driver, use of the vehicle for a common criminal mission, and stops along the way before abandoning it (during which [the passenger] apparently made no effort to disassociate himself from his friend or the stolen vehicle)."  (*Ibid.*)

20

Applying *Clark* and *Land*, we conclude that substantial evidence supports a finding that although Jones and Abernathy were passengers in the stolen Honda being driven by Jordan, they were parties to, accessories to or accomplices in the driving of the stolen Honda.

As required by *Clark*, there is evidence that Jones and Abernathy "kn[ew] that the vehicle had been unlawfully acquired and . . . had that knowledge at a time when [they] could be said to have, in some way, aided or assisted in the driving." (*Clark*, *supra*, 251 Cal.App.2d at p. 874.) Specifically, although Abernathy denied knowing before the robbery that the Honda was stolen, he testified that as soon as he and Jones arrived back at the Honda after robbing Berki and Faudoa, Jordan informed them that because the Honda was stolen, he did not want to have a gun in the car. According to Abernathy's testimony, after acquiring knowledge that the Honda was stolen, he and Jones nevertheless drove in the Honda to visit Jordan's and Jones's girlfriends and after that stop, they once again got in the stolen Honda before being chased by Berki. Under the scenario described by Abernathy, there was ample opportunity for both Jones and Abernathy to decide to cease being passengers in the stolen Honda. This situation is accordingly not, as described in *Clark*, an instance where the defendants have no criminal liability because they found out that the car was stolen "after the ride started and when [they] could neither stop the trip nor leave the vehicle." (*Ibid.*)

In addition, there are several similarities between this case and the circumstances described in *Land* to support a finding that Jones and Abernathy were parties, accessories or accomplices to driving the stolen vehicle. Specifically, (1) Jones and Abernathy had a

21

"close relationship to the driver," in that all three defendants were friends; (2) all three defendants made "use of the vehicle for a common criminal mission"; and (3) the defendants made "stops along the way before abandoning [the vehicle] (during which [Jones and Abernathy] apparently made no effort to disassociate [themselves] from [their] friend or the stolen vehicle)." (*Land*, *supra*, 30 Cal.App.4th at p. 228.)

Accordingly, based on the evidence at trial, a reasonable juror could determine that although they were passengers in the stolen Honda driven by Jordan, both Jones and Abernathy were nevertheless guilty of unlawfully taking or driving the vehicle.

C.    *Defendants' Challenge to Their Sentences as Cruel and Unusual Punishment*

As we have described, each of the defendants was 17 years old when committing the crimes at issue. Based on that fact, the defendants contend that the trial court violated the prohibition on cruel and unusual punishment in the Eighth Amendment to the United States Constitution by sentencing them to indeterminate life terms in prison (50 years to life for Abernathy and 25 years to life for Jones and Jordan). Further, Jones and Jordan contend that because they were not shooters during the murder, and in light of their age at the time of the crime, their sentences are disproportionate to their crimes and therefore constitute cruel and unusual punishment in violation of the federal and state Constitutions.

We apply a de novo standard of review to these issues. (*People v. Em* (2009) 171 Cal.App.4th 964, 971 (*Em*) [" 'Whether a punishment is cruel or unusual is a question of law for the appellate court . . . .' "].)

22

1.	*Abernathy's Sentence*

As the trial court described at sentencing, based on the crimes for which Abernathy was convicted, the longest sentence that the trial court could impose on Abernathy (if it selected midterm sentences for the determinate terms), was 83 years to life. Further, based on a mandatory 25-year-to-life sentence for the first degree murder conviction (§ 190, subd. (a)), plus a mandatory 25-year-to-life sentence for the firearm enhancement (§ 12022.53, subd.(d)), the shortest sentence that the trial court could impose on Abernathy was 50 years to life, even if all the sentences for the other counts were run concurrently or stayed. Abernathy argued to the trial court that a sentence of 50 years to life would be a mandatory de facto life sentence without parole, given his actuarial life expectancy of 64.6 years as a Black male born in 1993, in that he would not be eligible for release from prison (taking into account his credits) until the age of 67 at the earliest.

The trial court acknowledged that given Abernathy's life expectancy, "an argument could be made" that the required minimum sentence of 50 years to life was a de facto life sentence without parole. The trial court therefore proceeded to apply the approach required by the controlling United States Supreme Court case law, *Miller v. Alabama* (2012) 567 U.S. __, 132 S.Ct. 2455 (*Miller*), which explains how the Eighth Amendment's prohibition on cruel and unusual punishment applies to a defendant who, like Abernathy, committed a homicide before the age of 18. Applying the approach required by *Miller*, the trial court concluded that based on the circumstances of Abernathy's case, including the age and maturity level at which Abernathy committed the

23

murder, Abernathy's family and social background, and the details of the crime, a sentence of 50 years to life did not constitute cruel and unusual punishment, and it accordingly imposed that sentence.[8]

### a. *Applicable Case Law*

We begin our analysis with a focus on the United States Supreme Court's case law applying the Eighth Amendment to the sentencing of juveniles.

The applicable line of cases begins with *Roper v. Simmons* (2005) 543 U.S. 551, 575 (*Roper*), which held that it is cruel and unusual punishment to impose the death penalty on a defendant who committed a capital crime when under the age of 18.

Next, *Graham v. Florida* (2010) 560 U.S. 48, 74 (*Graham*), decided that it is cruel and unusual punishment to sentence a defendant who committed a crime as a juvenile to life in prison without parole for a *nonhomicide* offense. Under *Graham*, "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime" but must "give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Id.* at p. 75.)

Finally, *Miller* considered the issue of whether the Eighth Amendment proscribes a *mandatory* life sentence without parole for a defendant convicted of a *homicide* for a killing that occurred prior to the defendant's 18th birthday. (*Miller*, *supra*, 567 U.S. __, 132 S.Ct. 2455.) *Miller* disapproved mandatory life sentences without parole for juvenile

---

[8]　The trial court stayed the sentence on one of the robbery counts, and ordered that the sentences for the remaining counts run concurrently to the 50-year-to-life term for the murder and the firearm enhancement.

24

homicide offenders, holding that a sentencing court must be given the *discretion* to consider the juvenile offender's age and youthful characteristics before deciding whether to impose a sentence of life without parole for a homicide conviction.  (*Miller*, *supra*, 567 U.S. ___, 132 S.Ct. at p. 2475.)

In the course of explaining why a mandatory life without parole sentence is unconstitutional when applied to a juvenile homicide offender, *Miller* set forth the factors that a sentencing court must consider before imposing such a sentence:  "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features — among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth — for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.  [Citations.]  And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it."  (*Miller*, *supra*, 567 U.S. ___, 132 S.Ct. at p. 2468.)  As *Miller* explained, "given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.  That is

25

especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id*. at p. 2469.)

Our Supreme Court recently examined *Miller* in *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*), stating that "[u]nder *Miller*, a state may authorize its courts to impose life without parole on a juvenile homicide offender when the penalty is discretionary and when the sentencing court's discretion is properly exercised in accordance with *Miller*."[9] (*Id*. at p. 1379.) As *Gutierrez* explained, in a homicide case involving a juvenile offender "the trial court must consider all relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile

---

[9]     *Gutierrez* examined the issue of how *Miller* impacted the constitutionality of section 190.5, subdivision (b), which provides that the penalty for 16- or 17-year-old juveniles who commit special circumstance murder "shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life," and which had been interpreted as creating a presumption in favor of a sentence of life without parole. (*Gutierrez*, *supra*, 58 Cal.4th at p. 1369, quoting § 190.5. subd. (b).) *Gutierrez* concluded that the statute should not be interpreted to create a presumption of a life sentence without parole and that a sentencing court should instead conduct the analysis described in *Miller* in deciding what sentence to impose on a juvenile offender sentenced under section 190.5, subdivision (b). (*Gutierrez*, at pp. 1360-1361.)

offenders.' [Citation.] To be sure, not every factor will necessarily be relevant in every case. . . . But *Miller* 'require[s] [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' " (*Id.* at p. 1390.)

One more recent decision by the California Supreme Court is pertinent here. In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our Supreme Court considered the constitutionality of a sentence of 110 years to life imposed on a defendant who was a juvenile when he committed the *nonhomicide* crimes that gave rise to his sentence. *Caballero* concluded that for the purpose of a constitutional analysis, the sentence should be treated as a de facto life sentence without parole since there would be no opportunity for the defendant to be released from prison during his lifetime.[10] (*Id.* at p. 268.)

> b.        *Abernathy's Sentence Is Constitutional Under* Miller

With the above case law in mind, we turn to Abernathy's challenge to his sentence. Abernathy contends that given his life expectancy, the sentence of 50 years to life — which is the minimum sentence statutorily authorized for his crimes — is a de facto mandatory life sentence without parole. Abernathy accordingly contends that *Miller* applies to his sentence, as it does to all juvenile homicide offenders who are subject to

---

[10]        *Caballero* dealt with juvenile *nonhomicide* offenders and thus applied the holding in *Graham*. Our Supreme Court currently has under review the issue of whether, for the purpose of *Miller*'s holding that a mandatory life sentence without parole is unconstitutional for juvenile *homicide* offenders, a de facto mandatory life sentence is the functional equivalent of an actual mandatory life sentence without parole. (*In re Alatriste* and *In re Bonilla* (2013) 220 Cal.App.4th 1232, review granted Feb. 19, 2014, S214652 (*Alatriste*), S214960 (*Bonilla*).)

mandatory life sentences without parole.  According to Abernathy, the trial court was thus required at sentencing to exercise its discretion to consider whether, given the factors set forth in *Miller*, it should impose a sentence of less than 50 years to life.

In evaluating this argument, the first issue is whether *Miller* applies to sentences that are not *literally* sentences of life without parole, but that — because of the length of time before the defendant will have an opportunity for release — are *de facto* life sentences without parole.  As we have explained, that issue is currently before our Supreme Court.  (See fn. 10, *ante*.)  As the issue is unsettled, we take the same approach as the trial court and assume for the sake our analysis, without deciding, that *Miller* applies to *de facto* life sentences without parole.  We will also assume, without deciding, that given Abernathy's life expectancy, a minimum statutorily authorized sentence of 50 years to life is a mandatory de facto life sentence, and that therefore, as Abernathy contends, *Miller* applies here.

Having assumed for the purposes of our analysis that *Miller* applies, the next issue is whether the trial court complied with *Miller* in how it conducted Abernathy's sentencing.  As we have noted, *Miller* requires that when faced with a sentencing scheme that requires a mandatory life sentence without parole for a juvenile homicide offender, the sentencing court must nevertheless exercise its discretion to determine whether it should impose the mandatory sentence in light of factors relating to the defendant's youth.  *Miller* directs the sentencing court to take into account the defendant's "immaturity, impetuosity, and failure to appreciate risks and consequences"; the defendant's "family and home environment"; "the circumstances of the homicide offense,

28

including the extent of [the defendant's] participation in the conduct and the way familial and peer pressures may have affected him"; the possibility that "incompetencies associated with youth" resulted in the defendant being charged with a greater offense than if he had been a more sophisticated participant in the criminal justice system; and "the possibility of rehabilitation." (*Miller*, *supra*, 567 U.S. at p. __, 132 S.Ct. at p. 2468.) As our Supreme Court explained in *Gutierrez,* "not every factor will necessarily be relevant in every case," but the sentencing court must " 'take into account how children are different.' " (*Gutierrez*, *supra*, 58 Cal.4th at p. 1390.)

Based on the trial court's extensive comments at sentencing, we conclude it complied with *Miller*'s requirements in sentencing Abernathy. As an initial matter, we note that the trial court expressly explained at the outset of its discussion that it was assuming for the sake of its sentencing decision that *Miller* applied, and it would accordingly conduct the analysis required by *Miller*. As the trial court explained, "I believe that it is appropriate for this court, in analyzing the cruel and unusual aspect of this sentence, to look at the individual factors of this defendant and this crime and make that analysis at this point." Further, the trial court prefaced its analysis by accurately summarizing the main point of *Miller*. "What I take from *Miller* . . . is that youth matters in making a sentencing decision. It must be allowed to factor into the equation of a sentence even in a homicide." The trial court then went on to analyze whether, based on the considerations in *Miller*, it should impose a sentence of less than 50 years to life. Specifically, the trial court pointed out the following factors: (1) Abernathy's age at the time of the murder was 17½, making him "not particularly young," and thus more mature

29

than many other juvenile offenders; (2) the nature of Abernathy's crimes was not childlike or youthful, in that the crimes were sophisticated and carried out as part of a scheme planned by Abernathy; (3) Abernathy had already committed the same type of armed robbery days earlier, showing that he understood the nature of what he was doing and did not merely act impulsively; (4) as Abernathy described during his testimony, he had a positive emotional reaction to intimidating and terrifying Castillo in the first robbery, which revealed something "very negative" about Abernathy's character; (5) Abernathy's motive for the crimes was not "youthful," and instead was "pure greed" not based on any financial need; (6) Abernathy's family and social background was not a mitigating factor impacting his decision to commit a crime as a juvenile, as he was not particularly disadvantaged or abused, was raised in a supportive and financially stable family, had friends who were not criminals, and had no substance abuse or mental health issues; (7) at the age of 17½ and at his maturity level as shown by the evidence, Abernathy was fully capable of understanding the risk of threatening people with loaded guns; and (8) according to Abernathy's comments to his codefendants in the jail cell on the night of the murder, he felt no remorse. Based on all of these considerations, the trial court concluded, "I do believe that there are some circumstances where 50 to life would be so disproportionate to the conduct involved or given the mitigating circumstances of a juvenile involved that it would be unconstitutional . . . , but this is not one of them."

In light of the fact that the trial court undertook a substantive and meaningful analysis of whether, in light of Abernathy's age at the time of the murder and other related factors, it should impose a sentence less than 50 years to life, we conclude that the

30

trial court fully complied with the requirements of *Miller*. Therefore, there is no merit to Abernathy's contention that the trial court sentenced him to 50 years to life in prison in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.[11]

2. *Jones's and Jordan's Sentences*

The trial court sentenced both Jones and Jordan to prison for 25 years to life. As they did in the trial court, Jordan and Jones contend that a sentence of 25 years to life constitutes cruel and unusual punishment under both the federal and state Constitutions.

a. *Federal Constitutional Argument Based on* Graham *and* Miller

Jordan's and Jones's main federal constitutional argument is based on the same Eighth Amendment case law we have discussed above, as set forth in *Roper*, *Graham* and *Miller*. Jordan and Jones contend that the standards in case law governing life sentences

---

[11] As the parties discuss, after the sentencing in this case, the Legislature passed Senate Bill No. 260, effective January 2014, which enacted section 3051. (Stats. (2013) ch. 312, § 4.) With certain exceptions not applicable here, section 3051 provides an opportunity for a juvenile offender to be released on parole irrespective of the sentence imposed by the trial court by requiring the Board of Parole Hearings to conduct "youth offender parole hearings" on a set schedule depending on the length of the prisoner's sentence. Specifically, youth offender parole hearings are held during the 15th year of incarceration for a prisoner serving a determinate sentence (*id.*, subd. (b)(1)), during the 20th year of incarceration for a prisoner serving a life term less than 25 years to life (*id.*, subd. (b)(2)), and during the 25th year of incarceration for a prisoner serving a life term of 25 years to life (*id.*, subd. (b)(3)). The question of how Senate Bill No. 260 impacts issues of cruel and unusual punishment for youth offenders is currently before our Supreme Court. (*In re Alatriste* and *In re Bonilla*, *supra*, 220 Cal.App.4th 1232, review granted Feb. 19, 2014, S214652 (*Alatriste*), S214960 (*Bonilla*).) Here, however, because we conclude that there is no Eighth Amendment infirmity in Abernathy's sentence, we need not, and do not, reach the issue of whether Senate Bill No. 260 would have served to cure any Eighth Amendment violation by requiring a parole hearing after Abernathy served 25 years in prison.

31

without parole for juvenile offenders established in *Graham* and *Miller* should be extended to cases, such as theirs, in which they (1) are "exposed" to a life sentence, and (2) neither "killed nor intended to kill." As we will explain, we reject this argument.

The first problem with Jones's and Jordan's argument, is that neither Jones nor Jordan were sentenced to a life term without parole.[12] As they correctly describe the situation, they have merely been "exposed" to the possibility of a lifetime in prison because the parole board may decide not to release them after they become eligible for release in 25 years.[13] Our Supreme Court was very clear in *Graham* and *Miller* that the Eighth Amendment issues it was discussing arose only in the context of juvenile offenders who were sentenced to life in prison *without the possibility of parole*. As *Graham* explained, "[a] State is not required to *guarantee* eventual freedom to a juvenile offender convicted of a nonhomicide crime[,]" but "must . . . give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Graham*, *supra*, 560 U.S. 48, italics added.) Like *Graham*, *Miller* also applies only to "lifetime incarceration without *possibility* of parole." (*Miller*, *supra*, 567 U.S. ___, 132 S.Ct. at p. 2475, italics added.)

---

[12]     As we have done in connection with evaluating Abernathy's arguments, we will assume without deciding that *Caballero*'s holding that de facto life sentences without parole against a juvenile offender are barred by the Eighth Amendment for nonhomicide crimes (*Caballero*, *supra*, 55 Cal.4th at p. 268) is also applicable to *homicide* crimes, such as the murder convictions here.

[13]     Jordan acknowledges that "he was given a 25[-]year[-]to[-]life term and thus is eligible for parole when he is in his early 40's[,] possibly sooner."

Because Jones and Jordan were both sentenced to a term of 25 years to life, it is *possible* that they will be paroled from prison while they are in their forties, far before they are at the end of their life expectancy. Accordingly, *Jones* and *Jordan* have not been sentenced to a de facto prison term of life without parole, and neither *Graham* nor *Miller* apply. Under similar circumstances, our colleagues in *People v. Perez* (2013) 214 Cal.App.4th 49 (*Perez*) rejected the defendant's argument that a term of 30 years to life, for a nonhomicide crime committed at the age of 16, was cruel and unusual punishment under the Eighth Amendment. As *Perez* explained, because the defendant was eligible for release from prison at age 47, "by no stretch of the imagination can [the] case be called a 'functional' or 'de facto' [life without parole sentence], and therefore neither *Miller*, *Graham*, nor *Caballero* apply." (*Id*. at p. 58.)

We further reject Jordan's and Jones's contention that their sentences should be determined to be cruel and unusual punishment under *Miller* and *Graham* because they are juvenile offenders who purportedly "neither killed nor intended to kill." As the basis for this argument, Jordan and Jones point out that although they were convicted of first degree murder, neither of them shot at Berki and there was no evidence that they knew Abernathy was going to do so.

We need not decide whether, for the purposes of an Eighth Amendment analysis, a juvenile offender convicted of first degree murder under a felony-murder theory but who did not personally kill anyone should be treated as having committed a homicide crime or

33

a nonhomicide crime.[14]  Under either approach, Jordan's and Jones's sentences do not violate the Eighth Amendment as clarified in *Miller* and *Graham.*  If Jones and Jordan committed a *homicide* crime, then *Miller* applies, and the Eighth Amendment bars a mandatory term of life in prison without parole.  (*Miller*, *supra*, 567 U.S. ___, 132 S.Ct at p. 2475.)  If Jones and Jordan committed a *nonhomicide* crime, then *Graham* and *Cabellero* apply, and the Eighth Amendment bars a de facto sentence of life in prison without parole (*Graham*, *supra*, 560 U.S. at p. 74; *Caballero*, *supra*, 55 Cal.4th at p. 268).  But, as we have explained, Jones and Jordan did *not* receive *either* a mandatory *or* a discretionary life sentence without the possibility of parole.  Instead, they are eligible for release from prison when they are in their forties.  Therefore, the sentences do not constitute cruel and unusual punishment regardless of whether Jones and Jordan committed a homicide crime or a nonhomicide crime by participating in a felony murder, and regardless of whether *Graham* or *Miller* applies.

> b.  *Disproportionate Sentences*

As a second federal constitutional argument, Jordan and Jones contend that, regardless of the holdings in *Miller* and *Graham*, their sentences are unconstitutional

---

14    Jordan's and Jones's argument that they neither killed nor intended to kill is a reference to the statement in *Graham* that "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability" and thus should not be subjected to life in prison without parole.  (*Graham*, *supra*, 560 U.S. at p. 69.)  In *Miller*, Justice Breyer argued in his concurrence that a defendant convicted under a felony-murder theory may not have killed or intended to kill, and the Eighth Amendment analysis in *Graham* should accordingly apply in such cases. (*Miller*, *supra*, 567 U.S. ___, 132 S.Ct. at pp. 2475-2477.)  As we have explained, we need not resolve the issue.

under the Eighth Amendment because they offend principles of proportionality that are applicable to all defendants, not just juvenile offenders.

As our Supreme Court has explained, "the Eighth Amendment contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Graham*, *supra*, 560 U.S. at pp. 59-60, quoting concurrence of Kennedy, J. in *Harmelin v. Michigan* (1991) 501 U.S. 957, 997, 1000-1001.) In "determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime," "[a] court must begin by comparing the gravity of the offense and the severity of the sentence. [Citation.] '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." (*Graham*, *supra*, 560 U.S. at p. 60.) "The gross disproportionality principle reserves a constitutional violation for only the extraordinary case." (*Lockyer v. Andrade* (2003) 538 U.S. 63, 77.) Jones and Jordan argue that because they were convicted under a felony-murder theory and did not directly participate in killing Berki, a comparison of the gravity of their offenses with the severity of their sentences leads to the conclusion that a prison sentence of 25 years to life is grossly disproportionate to their crimes.

In a similar argument, Jones and Jordan also rely on case law developed under the California Constitution prohibiting disproportionate sentences. Article I, section 17 of the California Constitution prohibits the infliction of "[c]ruel or unusual punishment." A sentence will not be allowed to stand under the California Constitution "if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085, citing *In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*); *People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*).)

Under California law, a defendant attacking a sentence as cruel or unusual "must demonstrate his punishment is disproportionate in light of (1) the nature of the offense and the defendant's background, (2) the punishment for more serious offenses, or (3) punishment for similar offenses in other jurisdictions." (*In re Nunez* (2009) 173 Cal.App.4th 709, 725.) The defendant "need not establish all three factors—one may be sufficient [citation], but the [defendant] nevertheless must overcome a 'considerable burden' to show the sentence is disproportionate to his level of culpability [citation]. As a result, '[f]indings of disproportionality have occurred with exquisite rarity in the case law.' " (*Ibid.*) Although California case law sets forth three factors to consider in conducting a proportionality analysis, "the sole test remains . . . whether the punishment 'shocks the conscience and offends fundamental notions of human dignity.' " (*Dillon*, *supra*, 34 Cal.3d at p. 487, fn. 38.) "Successful challenges based on the traditional *Lynch-Dillon* line are extremely rare." (*Perez*, *supra*, 214 Cal.App.4th at p. 60.)

Jones and Jordan do not argue that a prison sentence of 25 years to life for first degree murder is disproportionate to (1) the punishment for more serious offenses, or (2) the punishment for first degree murder in other jurisdictions. Instead, Jordan and Jones limit their argument to the first factor described in the case law, i.e., whether their sentence is grossly disproportionate to the nature of the offense and their personal backgrounds. As this issue overlaps with the central issue posed by the federal proportionality analysis, i.e., whether the sentence is grossly disproportionate to the gravity of the offense (*Graham*, *supra*, 560 U.S. at p. 60), we consider both the federal and state constitutional proportionality challenges together. In conducting our analysis, "[w]e examine both the seriousness of the crime in the abstract and 'the totality of the circumstances surrounding the commission of the offense . . . , including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts.' " (*Em*, *supra*, 171 Cal.App.4th at p. 972.)

Turning to the nature of the crime, felony murder committed during a robbery is a serious and dangerous crime. As our Supreme Court has observed, "when it is viewed in the abstract robbery-murder presents a very high level of such danger, second only to deliberate and premeditated murder with malice aforethought." (*Dillon*, *supra*, 34 Cal.3d at p. 479.) Jones and Jordan argue, however, that in the unique circumstances of this case, a 25-year-to-life sentence for felony murder is disproportionate to the gravity of the crime because they were not the shooters, they had minimal or nonexistent criminal

37

history prior to this case,[15] and they were juveniles when they committed the instant offenses. As we will explain, we reject these arguments, and conclude that a sentence of 25 years to life was not grossly disproportionate to Jones's and Jordan's crime of felony murder.

First, although Jones and Jordan did not personally shoot Berki, they were nevertheless convicted of felony murder based on their willing participation in an armed robbery. "Life sentences pass constitutional muster for those convicted of aiding and abetting murder, and for those guilty of felony murder who did not intend to kill." (*Em*, *supra*, 171 Cal.App.4th at pp. 972-973.) Indeed, in *Em*, the court rejected a similar disproportionality argument, affirming a sentence of 50 years to life for a defendant convicted of felony murder for a murder that occurred when he was 15 years old. The defendant in *Em* was not the shooter, but he was a participant in an armed robbery, during which his companion shot the person they were trying to rob. (*Id*. at pp. 967-968.) *Em* explained that "[a]lthough defendant did not shoot the gun himself, the robbery and murder took place with his culpable involvement. Defendant's participation in the crime was demonstrably not 'passive . . . .' " (*Id*. at p. 975.) As here, the facts in *Em* supported the conclusion that the "[d]efendant committed this crime, not because he was in the

_____

15     Jordan had no criminal history prior to this case, but the evidence at trial was that he was a documented gang member as of February 2008. Jones had several true findings as a juvenile, of increasing seriousness, for petty theft, resisting an officer, and assault with a deadly weapon during a gang-related shooting. The evidence at trial was that Jones was a documented gang member as of January 2009.

wrong place at the wrong time, but because he has a complete disregard for the rule of law and lack of respect for human life."  (*Id*. at p. 976.)

Similar to *Em*, other cases have rejected arguments by juvenile offenders that a sentence for first degree murder violates the proportionality principle of the California Constitution even though the defendant was not the person who committed the killing, when the defendant knowingly participated in a serious crime that led to the murder. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 7, 16 [rejecting a proportionality challenge to 50-year-to-life sentences imposed on juvenile offenders for first degree murder, when the defendants were not shooters but participated in an armed attack]; *People v. Ortiz* (1997) 57 Cal.App.4th 480, 486-487 [affirming a 26-year-to-life sentence for a 14-year-old gang member convicted of felony murder occurring when his companion shot someone during a robbery].)

Next, a focus on Jones's and Jordan's personal characteristics also results in the conclusion that the sentence is not grossly disproportionate.  As case law directs, we inquire "whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind."  (*Dillon*, *supra*, 34 Cal.3d at p. 479.)

As the trial court pointed out, both Jordan and Jones were culpable participants in the events leading up to the murder.  Jones threatened Berki with a firearm during the robbery and demanded money.  Jordan was the getaway driver in a car that he had stolen. The defendants' comments to each other in the jail cell after they were arrested showed no remorse and provided no indication that this was an exceptional circumstance where

39

either Jordan or Jones unknowingly participated in, or were pressured to take part in, criminal activity. On the contrary, even though there was evidence at trial that Abernathy may not have been a gang member, it is undisputed that both Jordan and Jones were active members of criminal street gangs. In addition, Jones had a criminal history of escalating seriousness, which included taking part in a violent gang assault. Therefore, we do not perceive this as a situation where the defendants' personal characteristics and role in the commission of the crimes make a sentence of 25 years to life in prison a grossly disproportionate punishment for the crime of first degree murder.

Jones and Jordan argue that this case is like *Dillon*, *supra*, 34 Cal.3d 441, in which our Supreme Court concluded that a juvenile offender convicted of felony murder should have his punishment reduced to the applicable sentence for second degree murder based on principles of proportionality under the California Constitution. (*Dillon*, at p. 489.) In *Dillon*, the court explained that the defendant was 17 years old during the crime and had shot the victim nine times in a panic during an unsophisticated attempt to steal from a marijuana farm. (*Id*. at p. 452.) Concluding that the indeterminate life term for first degree murder was a disproportionate sentence because of the defendant's immaturity and the nature of his crime, *Dillon* explained, "at the time of the events herein defendant was an unusually immature youth. He had had no prior trouble with the law, and . . . was not the prototype of a hardened criminal who poses a grave threat to society. . . . [W]ith hindsight his response might appear unreasonable; but there is ample evidence that because of his immaturity he neither foresaw the risk he was creating nor was able to extricate himself without panicking when that risk seemed to eventuate." (*Id*. at p. 488.)

40

Because of the sophisticated nature of the robbery that Jordan and Jones participated in here, the absence of any evidence that they were particularly immature or that they failed to appreciate the risk of violence in committing an armed robbery, as well as the fact that Jordan and Jones were members of criminal street gangs, this is simply not a case like *Dillon* where the felony murder was the result of the actions of an immature youth who did not foresee the risks inherent in his behavior. As has long been acknowledged, "*Dillon*'s application of a proportionality analysis to reduce a first degree felony-murder conviction must be viewed as representing an exception rather than a general rule." (*People v. Munoz* (1984) 157 Cal.App.3d 999, 1014.)

We agree with the trial court that, unlike *Dillon*, this is not a case "that is so unusual and mitigating, either the crime or the defendants, that the statutory mandated sentence by the Legislature is unconstitutional." Therefore, we reject Jordan's and Jones's argument that their sentences are grossly disproportionate under either the federal or state Constitutions.

D.      *Defendants' Presentence Custody Credit*

In each of their opening briefs, defendants argued that the trial court incorrectly calculated the applicable presentence custody credit pursuant to section 2900.5 in that it awarded 751 days of credit instead of 752 days. As defendants point out, they were arrested late on the night of May 11, 2011, and sentenced on May 31, 2013, which encompasses 752 days of presentence custody, but the trial court awarded only 751 days of presentence custody credit.

41

During the pendency of the appeal, Jones applied for and obtained an order from the trial court correcting the error. Accordingly, Jones's appeal on the presentence custody credits is moot, and we do not address it further.

However, Jordan and Abernathy did not apply for relief from the trial court. We have the authority on appeal to amend the judgment to award the correct amount of presentence custody credits. (*People v. Acosta* (1996) 48 Cal.App.4th 411, 427-428; *People v. Donan* (2004) 117 Cal.App.4th 784, 792-793.) Based on evidence that the three defendants were each in custody from May 11, 2011, to May 31, 2013, and the trial court's conclusion that Jones should have received an extra day of presentence custody credit, we conclude that Jordan and Abernathy are also entitled to an extra day of presentence custody credit. We accordingly modify the judgment to award Jordan and Abernathy 752 days of presentence custody credit instead of 751 days.

E.       *Correction of Clerical Error in the Abstract of Judgment Regarding Jones's Sentence*

At sentencing, the trial court ordered that Jones's five-year sentence on count 4 for shooting at an occupied vehicle (§ 246) was to be stayed pursuant to section 654. However, the trial court's minute order and the abstract of judgment erroneously state that count 4 was ordered to run concurrently with the other counts.

The record of the trial court's oral pronouncement of sentence controls over a conflicting minute order or abstract of judgment. (*People v. Farell* (2002) 28 Cal.4th 381, 384; *People v. Mesa* (1975) 14 Cal.3d 466, 471.) Based on this principle, the Attorney General concedes that the abstract of judgment should be corrected to reflect the

trial court's decision to stay the sentence on count 4. We accordingly direct that Jones's abstract of judgment be corrected to show that the trial court ordered that the sentence on count 4 be stayed pursuant to section 654.

## DISPOSITION

As to Abernathy and Jordan, we direct the trial court to amend the abstract of judgment to award an additional day of presentence custody credit. As to Jones, we direct the trial court to amend the abstract of judgment to reflect that Jones's sentence on count 4 is stayed pursuant to section 654. The trial court shall forward the amended abstracts of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgments are affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.